[Civ. No. 29423. Fourth Dist., Div. Two. May 4, 1983.]

KENNETH COHEN et al., Plaintiffs and Appellants, v.
KITE HILL COMMUNITY ASSOCIATION, Defendant and Respondent.

**COUNSEL**

Hickey, Neuland, Pardes & Colletta and Richard P. Neuland for Plaintiffs and Appellants.

Feldsott, Lee & Van Gemert and Martin L. Lee for Defendant and Respondent.

**OPINION**

**McDANIEL, J.**—This is an appeal from a judgment of dismissal entered after an order sustaining the demurrer of defendant, Kite Hill Community Association (the Association), to the plaintiffs' fourth amended complaint. Because we conclude that the plaintiffs finally succeeded in pleading a cause of action, we shall reverse the judgment.

### FACTS[1]

As reflected by the allegations of plaintiffs' complaint, Kite Hill is a residential community located in the rolling hills of southern Orange County.

Plaintiffs, Mr. and Mrs. Cohen, purchased a lot in Kite Hill which afforded a panoramic view of the surrounding countryside. They paid a premium for this view.

The Association, a nonprofit corporation duly organized and existing under the laws of California, is composed of all of the homeowners in Kite Hill. It

---

[1]On appeal, we deem the Association's demurrer to have admitted all well-pleaded material facts. (*Thompson* v. *County of Alameda* (1980) 27 Cal.3d 741, 746 [167 Cal.Rptr. 70, 614 P.2d 728, 12 A.L.R.4th 701].)

was organized by the developer, S & S Construction Company, for the purpose of administering and enforcing the declaration of covenants, conditions and restrictions (the Declaration) which was recorded as to the entire tract and incorporated by reference into the respective deeds by which all Kite Hill residents acquired their homes in this tract. The Declaration was also attached as an exhibit to the complaint.

Every owner of a lot in Kite Hill is automatically a member of the Association and subject to payment of regular and special assessments to the Association for the purpose of carrying out its community functions.

Shortly after the Cohens purchased their home, they submitted to the Association's architectural committee (the Committee) plans for certain improvements and landscaping in their front and rear yards. The Declaration requires that such plans be submitted to the Committee in writing and be approved before any construction can begin.

One part of the plan approved by the Committee was a slump stone and wrought iron fence (a two-foot slump stone base topped by a three-foot iron fence). This is the type of fence designated by the Declaration for use in a lot such as the Cohens'; i.e., a side yard with a view.

Shortly thereafter, plaintiffs' neighbors, the Ehles, received approval from the Committee to construct a solid slump stone fence immediately adjacent to the Cohens' slump stone and wrought iron fence. The Ehles' is the type of fence designated in the Declaration for a side yard *without* a view.

Plaintiffs objected to the installation of the nonconforming fence because they believed that it would materially obstruct their view. However, their efforts to persuade the Ehles and the Association to modify or prevent the construction were unsuccessful.

The Cohens then initiated this lawsuit against the Ehles and the Association,[2] and contemporaneously sought a temporary restraining order to prevent the Ehles from completing construction of the fence. Although the attorneys for plaintiffs and the Ehles stipulated to the issuance of a temporary restraining order pending a hearing, the fence was substantially completed by the time the hearing occurred. The trial court denied the temporary restraining order, and the plaintiffs withdrew their application for a preliminary injunction.

---

[2]Plaintiffs also named as defendants their other neighbors, the Lees, for construction of certain improvements without the approval of the Committee, as well as S & S Construction Company.

Plaintiffs' complaint[3] alleged that the Association and its architectural committee, in approving the Ehles' construction plans, had: (1) breached the covenants contained in the Declaration; (2) breached their fiduciary duty owed to plaintiffs; (3) breached their duty of good faith and fair dealing; (4) been negligent; and (5) committed "willful misconduct or other intentional conduct."

In the key charging allegations, the complaint alleged that the "solid wall of slump block as approved by the Association and installed by Defendants Ehle is not a permitted fence under Exhibit 'C' of the Kite Hill Restrictions . . ."; that the "approval by the Architectural Committee of the Architectural [sic] plans of Defendants Ehle . . . is in violation of the mandates of the Kite Hill Restrictions and a clear abuse of their discretion"; that the Association acted "with full knowledge of their breach of the recorded Kite Hill Restrictions . . . [and] . . . in willfull, conscious and reckless disregard for Plaintiffs' rights"; and, that "as a direct and proximate result of the Defendant's [sic] violation of the Kite Hill Restrictions the Plaintiffs have been damaged for the loss of use and enjoyment of their property and for diminution in the value of their property. . . ."

Plaintiffs sought damages and a mandatory injunction to compel the Association to take certain steps to force the Ehles to comply with the architectural standards set forth in the Declaration.

The Association demurred to the plaintiffs' complaint on the ground that it failed to state a cause of action and that it was "uncertain and unintelligible." The trial court sustained the Association's demurrer to the complaint. After the judgment of dismissal, plaintiffs filed this appeal.

DISCUSSION

A. *The Association's Duties Under the Declaration*

The fundamental question presented here is whether plaintiffs' complaint alleged facts sufficient to state a cause of action against the Association. More precisely, did the complaint allege facts sufficient to establish that the Association owed a duty to plaintiffs and that the former breached that duty, thereby entitling plaintiffs to some or all of the remedies sought? Such a determination must be based on the terms and conditions of the Declaration. We shall proceed, therefore, to an examination of the relevant provisions of this document before turning to the central question of duty.

As previously noted, the Association is a nonprofit corporation whose members are the owners of homes in the Kite Hill development in Orange

---

[3]Plaintiffs amended their complaint several times. The trial court sustained the Association's demurrer to their fourth amended complaint.

County. The Declaration provides that membership in the Association is mandatory for every fee owner of a lot in the development, and that every such member is subject to assessments by the Association "for the purpose of providing for and promoting the pleasure, recreation, health, safety and social welfare of the Members, including the enhancement of the value, desirability and attractiveness of the project. . . ."

The Association is responsible for a broad catalogue of services to the community, including maintenance and landscaping of the common areas, such as pools, hot tubs, tennis courts, and utility facilities.

Another important function of the Association is to preserve the aesthetic quality and property values within the community. To this end, the Declaration contains an elaborate and detailed list of restrictions on the types of construction, improvements, landscaping and general activities which individual homeowners may install and engage in on their individual properties.

Article VII of the Declaration is concerned specifically with "Architectural and Landscaping Control" and contains 11 sections. Section 1 in pertinent part provides: "*Architectural Approval.* No fence, wall, building, sign or other structure (including basketball standards), or exterior addition to or change or alteration thereof (including painting) or landscaping, shall be commenced, constructed, erected, placed, altered, maintained or permitted to remain on the Project or any portion thereof, until plans and specifications shall have been submitted to and approved in writing by an architectural committee, initially to be appointed by the Declarant (the 'Architectural Committee'). . . . All such plans and specifications shall be in writing over the signature of the Owner of the property or such Owner's authorized agent. Approval shall be based, among other things, on adequacy of site dimensions; adequacy of structural design and material; conformity and harmony of external design with neighboring structures; *effect of location and use of improvements and landscaping on neighboring property,* improvements, landscaping, operations and uses; relation of topography, grade and finished ground elevation of the property being improved to that of neighboring property; proper facing of main elevations with respect to nearby streets; *preservation of view and aesthetic beauty with respect to fences, walls and landscaping*; . . . and conformity of the plans and specifications to the purpose and general plan and intent of this Declaration. In any event, the Architectural Committee shall have the right, but not the obligation, to require any Member to remove, trim, top, or prune any shrub, tree, bush, plant or hedge which such Committee reasonably believes *materially obstructs the view of any Lot.* . . ." (Italics added.)

With regard specifically to fences, article VII, section 11 provides: "In the event that any Owner of a Lot within the Project wishes to install a fence

('fence') on his Lot in addition to complying with the other provisions of this Article, *any such Owner shall also comply with the requirements of Exhibit 'C'* attached hereto and incorporated herein by this reference, which Exhibit sets forth the specifications for any Fence. The location of any Fence shall be as determined by the Architectural Committee in its sole and absolute discretion; provided, however, that any Fence shall be located in such a fashion as to assure adequate access to adjacent real property in order that said real property may be maintained." (Italics added.)

"Exhibit C" is a series of diagrams which both illustrate the type and dimensions of the fences which are approved for use in the project, and indicate where each fence may properly be located. Thus, "Sheet 1" of exhibit C (as amended) shows a solid slump block fence. The diagram specifies what type of block may be used, the dimensions of the blocks, and the maximum allowable height of the fence. This diagram is labeled "SLUMP BLOCK WALL @ SIDEYARD WITHOUT VIEW." "Sheet 2" illustrates a second fence, this one consisting of a two-foot slump block foundation topped by a three-foot wrought iron bar section, for a total maximum height of five feet. Sheet 2 is labeled, "SLUMP BLOCK & WROUGHT IRON WALL @ REAR & SIDEYARD W/VIEW."

As noted, the Declaration provides that all plans for any improvements must be submitted to the architectural committee. According to the Declaration, the Committee must consist of "not less than three nor more than five members." The Committee is empowered, "in its sole discretion," to amend the restrictions, or, "[w]here circumstances such as topography, location of property lines, location of trees, configuration of Lots, or other matters require, may . . . [allow] reasonable variances . . . provided . . . that all such variances [are] in keeping with the general plan for the improvement and development of the Project."

The Association is charged, in the Declaration, with the broad affirmative duty of "administering and enforcing these covenants, conditions and restrictions." The Declaration vests the Association with the equivalent means of enforcing its obligations, as well. Thus, article XVI, section 4, entitled "Enforcement," provides that the association "shall have the right to enforce by proceedings at law or in equity all covenants, conditions, restrictions, easements, reservations, liens and charges now or hereafter imposed by the Declaration . . . including, without limitation, the right to prosecute a proceeding at law or in equity against the person or persons who have violated or are attempting to violate any of these covenants, conditions, restrictions . . . to enjoin or prevent them from doing so, to cause said violation to be remedied and/or to recover damages for said violation."

In addition to the affirmative duties recited above, the Declaration also contains several so-called "exculpatory" clauses. These clauses purport to absolve the Association from any affirmative duty to enforce any of the covenants, conditions and restrictions in the Declaration, and to immunize the Association from liability for any of its acts of malfeasance or nonfeasance. Thus, the concluding sentence of article VII, section 1 states: "The [Association] shall not be required to comply with any of the provisions of this Section 1." Section 4 of the same article provides that the Association "shall (not) be liable in damages to anyone submitting plans or specifications to them for approval, or to any Owner of property affected by this Declaration by reason of mistake in judgment, negligence or nonfeasance arising out of or in connection with the approval or disapproval or failure to approve or disapprove any such plans or specifications, . . ." Moreover, just in case any doubt remained as to the intent to establish the Association's immunity to suit, Article XVI, section 12 provides:"To the fullest extent permitted by law, neither the Board, any committees of the Association nor any member shall be liable to any Member or Owner or the Association for any damage, loss or prejudice suffered or claimed on account of any decision, approval or disapproval of plans or specifications (whether or not defective), course of action, act, omission, error, negligence or the like made in good faith within which such Board, committee, or persons reasonably believed to be the scope of their duties."

Having set forth the relevant provisions in the Declaration, we now turn to the central legal issue, the nature and extent of the Association's duty to plaintiffs with reference to the codefendants' fence.

■ It is a settled rule of law that homeowners' associations must exercise their authority to approve or disapprove an individual homeowner's construction or improvement plans in conformity with the declaration of covenants and restrictions, and in good faith. (*Hannula* v. *Hacienda Homes* (1949) 34 Cal.2d 442, 447 [211 P.2d 302, 19 A.L.R.2d 1268]; *Branwell* v. *Kuhle* (1960) 183 Cal.App.2d 767, 779 [183 Cal.Rptr. 767].) As the court in *Hannula* stated: "Each of the decisions enforcing like restrictions has held that the refusal to approve plans must be a reasonable determination made in good faith." (*Hannula* v. *Hacienda Homes, supra,* 34 Cal.2d 442, 447.) The same requirement of good faith applies equally to the approval of plans. "The converse should likewise be true, . . . '[T]he power to approve plans . . . must not be exercised capriciously or arbitrarily.'" (*Bramwell* v. *Kuhle, supra,* 183 Cal.App.2d 767, 779; see also *Norris* v. *Phillips* (Colo. App. 1981) 626 P.2d 717, 719.)

■ Furthermore, in recognition of the increasingly important role played by private homeowners' associations in such public-service functions as maintenance and repair of public areas and utilities, street and common area lighting, sanitation and the regulation and enforcement of zoning ordinances,

the courts have recognized that such associations owe a fiduciary duty to their members. (See *Raven's Cove Townhomes, Inc.* v. *Knuppe Development Co.* (1981) 114 Cal.App.3d 783, 799 [171 Cal.Rptr. 334].)

In a thoughtful article on *Concepts of Liability in the Development and Administration of Condominium and Home Owners Associations* (1976) 12 Wake Forest Law Review at page 915, the authors, Hyatt and Rhoads, note the increasingly "quasi-governmental" nature of the responsibilities of such associations: "The other essential role directly relates to the association's regulatory powers; and upon analysis of the association's functions, one clearly sees the association as a quasi-government entity paralleling in almost every case the powers, duties, and responsibilities of a municipal government. As a 'minigovernment,' the association provides to its members, in almost every case, utility services, road maintenance, street and common area lighting, and refuse removal. In many cases, it also provides security services and various forms of communication within the community. There is, moreover, a clear analogy to the municipal police and public safety functions. All of these functions are financed through assessments or taxes levied upon the members of the community, with powers vested in the board of directors, council of co-owners, board of managers, or other similar body clearly analogous to the governing body of a municipality. Terminology varies from region to region; however, the duties and responsibilities remain the same." (*Id.*, at p. 918, fns. omitted.)

As reflected by the law review article noted, membership in an association is usually mandatory. Such is true here. And the powers of such associations are extensive. "By his acceptance, the purchaser automatically becomes a member of the association created by the declaration and submits to the authority of the association and to the restrictions upon the use and enjoyment of the property contained in the declaration. Because each owner automatically becomes a member of the association upon taking title and because the association is empowered to levy and to collect assessments, to make and to enforce rules, and to permit or to deny certain uses of the property, the association has the power, and in many cases the obligation, to exert tremendous influence on the bundle of rights normally enjoyed as a concomitant part of fee simple ownership of property." (*Id.*, at p. 917.)

With power, of course, comes the potential for abuse. Therefore, the Association must be held to a high standard of responsibility: "The business and governmental aspects of the association and the association's relationship to its members clearly give rise to a special sense of responsibility upon the officers and directors. . . . This special responsibility is manifested in the requirements of fiduciary duties and the requirements of due process, equal protection, and fair dealing." (*Id.*, at p. 921.) (See *Raven's Cove Townhomes, Inc.* v. *Knuppe Development Co., supra,* 114 Cal.App.3d 783, 792-799.)

The Kite Hill Community Association's approval of a fence not in conformity with the Declaration is analogous to the administrative award of a zoning variance. In the zoning context as well as here, a departure from the master plan in the Declaration stands to affect most adversely those who hold rights in neighboring property. Hence, what the California Supreme Court has stated with regard to judicial review of grants of variances applies equally well to the Association's actions herein: "[C]ourts must meaningfully review grants of variances in order to protect the interests of those who hold rights in property nearby the parcel for which a variance is sought. A zoning scheme, after all, is similar in some respects to a contract; each party foregoes rights to use its land as it wishes in return for the assurance that the use of neighboring property will be similarly restricted, the rationale being that such mutual restriction can enhance total community welfare. [Citations.] If the interest of these parties in preventing unjustified variance awards for neighboring land is not sufficiently protected, the consequence will be subversion of the critical reciprocity upon which zoning regulation rests." (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 517-518 [113 Cal.Rptr. 836, 522 P.2d 12].) For nearly identical reasons, we conclude that the courts must be available to protect neighboring property interests from arbitrary actions by homeowner associations.

■ Thus, it follows that the trial court must review the Association's decision approving the Ehles' fence to insure that it was neither arbitrary nor in violation of the restrictions contained in the Declaration. (See cases cited in Annot., 40 A.L.R.3d 864.) Moreover, where the matter is up for review on appeal from a judgment of dismissal upon the sustaining of a demurrer, the standard of review is the same, i.e., to test as a matter of law whether the action of the Association could have been arbitrary. In our view, the complaint has succeeded in pleading this possibility, and a trial is necessary to determine if the Association action was in fact arbitrary.

■ Turning to the next point, there is no merit in the Association's argument that its duty of good faith extended only to its members as a group and not to its members individually. The Declaration expressly provides that the Committee's approval of improvements "shall be based, among other things, on . . . [the] effect of location and use of improvements and landscaping on *neighboring* property, improvements, landscaping, operations and uses; . . ." (Italics added.)

The Association advanced the proposition (during oral argument) that the Committee's approval of improvement plans could be "arbitrary" as to an individual homeowner, yet reasonable in light of the overriding interests of the community. Nonsense. Like any community, Kite Hill consists of individual members who form in the aggregate an organic whole. Thus, like any govern-

ment, the Association must balance individual interests against the general welfare. No decision of the Committee could possibly be deemed "arbitrary" as to an individual homeowner if it were based upon a superseding duty to the community at large. The Association's duty of good faith subsumes an obligation to reconcile in a fair and equitable way the interests of the community with the interests of the individuals residing therein.

■ Nor is there merit in the argument that a homeowner aggrieved by a decision of the Association with regard to a *neighbor's* improvement should be limited to suit against that neighbor. As earlier noted, the covenants and restrictions create an affirmative duty on the part of the Association to protect individual homeowners affected by the improvement. More importantly, the Declaration clothes *the Association* with full authority to undertake all necessary legal actions to fulfill its protective duties.

Furthermore, it is apparent that but for the allegedly arbitrary approval by the Committee of the codefendant's fence, plaintiffs might never have been forced to pursue a legal remedy in the first place.

Moreover, in any action by plaintiffs against their neighbors, the sole question for determination will be whether the actions of the architectural committee have been arbitrary. In an action to determine whether the Committee's ruling was arbitrary or sound, the Association would obviously be a proper, if not an indispensable, party.

A nearly identical situation confronted the court in *Norris* v. *Phillips, supra,* 626 P.2d 717. Plaintiffs owned property adjacent to defendants' in a residential community. Despite plaintiffs' objections the architectural control committee approved defendants' plan to construct a barn on their property. Plaintiffs filed suit against their neighbors as well as against the committee seeking to enjoin construction, but the committee was dismissed from the suit and the dismissal was not appealed. Plaintiffs prevailed at trial. The Court of Appeal reversed, holding that the trial court had failed to apply the correct standard in measuring the committee's actions. "[T]he trial court's determination of a breach of covenant, without a determination that the Architectural Control Committee acted unreasonably or in bad faith, was in error." (*Id.,* at p. 719.) Rather than remand for a determination using the proper standard of review, however, the *Norris* court reversed. They did so because the committee had earlier been dismissed. "In such a challenge, the Architectural Control Committee is an indispensable party. In that the architectural control committee was dismissed out of this suit and that dismissal has not been appealed, a remand for a determination that the committee acted unreasonably or in bad faith is not possible." (*Id.,* at p. 719, fn. 1.)

Similarly, plaintiffs' suit here turns on the good faith and lack of arbitrariness of the Committee's approval, assessed in the light of all of the provisions of the Declaration. It appears from the record that the fence in question was not in conformity with the provisions of the Declaration, particularly the provisions contained in exhibit C, inasmuch as the codefendants placed a solid stone fence on a sideyard with a view, whereas exhibit C clearly requires a wrought iron open fence. Although the Declaration vests "sole discretion" in the Committee and allows for reasonable variances, their decisions must be "in keeping with the general plan for the improvement and development of the Project," and of course, must be made in good faith and not be arbitrary. These are clearly questions of fact for a jury. Accordingly, the Association was a proper defendant in the action below, and dismissing it from the action was error.

### B. *The Effect of the Exculpatory Clauses*

■ Notwithstanding the Association's clear affirmative duty to act in good faith and to avoid arbitrary decisions in applying the covenants and restrictions, the question remains whether the exculpatory clauses effectively cancelled out that duty and thereby immunized the Association from suit. We conclude that they do not.

The law has traditionally viewed with disfavor attempts to secure insulation from one's own negligence or wilful misconduct, and such provisions are strictly construed against the person relying on them, particularly where such person is their author. (*Viotti* v. *Giomi* (1964) 230 Cal.App.2d 730, 739 [41 Cal.Rptr. 345]; *Sproul* v. *Cuddy* (1955) 131 Cal.App.2d 85, 94-95 [280 P.2d 158]; *Basin Oil Co.* v. *Baash-Ross Tool Co.* (1954) 125 Cal.App.2d 578, 594-597 [271 P.2d 122].) Here, the Association is the creation and successor of the author, S & S Construction Company, and therefore subject to this rule of strict construction.

Furthermore, it is the express statutory policy of this state that "[a]ll contracts which have for their object, directly or indirectly, to exempt anyone from the responsibility for his own fraud or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law." (Civ. Code, § 1668.)

This public policy applies with added force when the exculpatory provision purports to immunize persons charged with a fiduciary duty from the consequences of betraying their trusts. (See *Mitchell* v. *Dilbeck* (1937) 10 Cal.2d 341 [74 P.2d 233]; *Forbes* v. *McDonald* (1879) 54 Cal. 98.)

■ Moreover, the California Supreme Court has evinced a clear policy of enforcing only those exculpatory provisions which do not affect "the public in-

terest." (*Tunkl* v. *Regents of the University of California* (1963) 60 Cal.2d 92, 96 [32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693].) Factors to be considered in determining whether a business or transaction affects a public interest include: (a) whether the matter is suitable for public regulation; (b) whether the party provides a service of importance to the public; (c) whether the party invoking it possesses a bargaining advantage against any member of the public who seeks such service; (d) and whether one party is particularly subject to the other's control and the risk of his or her carelessness. (*Id.*, at pp. 98-101.)

Applying one or more of these criteria, the courts have invalidated exculpatory clauses invoked by banks (*Hiroshima* v. *Bank of Italy* (1926) 78 Cal.App. 362 [248 P. 947]; *Vilner* v. *Crocker National Bank* (1979) 89 Cal.App.3d 732 [152 Cal.Rptr. 850]), hospitals (*Tunkl* v. *Regents of the University of California, supra,* 60 Cal.2d 92; *Westlake Community Hosp.* v. *Superior Court* (1976) 17 Cal.3d 465 [131 Cal.Rptr. 90, 551 P.2d 410]), and apartment complexes (*Henrioulle* v. *Marin Ventures, Inc.* (1978) 20 Cal.3d 512 [143 Cal.Rptr. 247, 573 P.2d 465]).

For the reasons earlier stated, we view the Association of homeowners as occupying a particularly elevated position of trust because of the many interests it monitors and services it performs. Therefore, we hold that the exculpatory provisions contained in the Declaration constitute no bar to suit against the Association.

The arguments set forth by the Association merit little consideration. It argued most strenuously that the Declaration does not create an easement or equitable servitude giving plaintiffs the right to an unobstructed "view." That is plainly not the issue here. The central question is whether the Association, under the Declaration, has a duty to act in good faith and avoid arbitrary decisions in approving the plans for construction of a fence on codefendants' property.

Nor are plaintiffs barred from filing suit because they are members of the Association, a nonprofit corporation. It is well settled that members may sue such entities for personal injuries. Nor, finally, is the injunctive relief requested by plaintiffs inappropriate or impractical. It is well within the trial court's power, if it determines that the architectural committee breached its duty, to order the Association to exercise its authority under the Declaration to compel compliance with the architectural standards set forth therein.

In sum, we hold that the Association in reviewing the codefendant's improvement plan owed a fiduciary duty to plaintiffs to act in good faith and to avoid arbitrary action, and that there is an issue of fact raised by the pleadings

as to whether the Association did so. As a consequence, the demurrer was improperly sustained.

### DISPOSITION

The judgment is reversed.

Morris, P. J., and Kaufman, J., concurred.