[No. D008066. Fourth Dist., Div. One. Nov. 17, 1989.]

B.C.E. DEVELOPMENT, INC., Plaintiff and Respondent, v. CARROLL J. SMITH et al., Defendants and Appellants.

**COUNSEL**

John V. Stanley for Defendants and Appellants.

Nicholas C. Banche and K. Martin White for Plaintiff and Respondent.

**OPINION**

**FROEHLICH, J.**—La Costa Land Company (La Costa) was a corporation engaged in the development and sale of residential realty. It developed and marketed a multi-unit project called La Costa South Unit No. 1. In June of 1968 La Costa caused to be recorded a "Declaration and Establishment of Protective Conditions and Restrictions" (the CC&Rs) which purported to establish restrictions of various kinds on all lots within the subdivision. Deeds to individual parcels, including the deed of defendants Smiths' (hereafter Smiths) predecessor in interest, referred to the CC&Rs and incorporated the same as part of the conveyance. The CC&Rs provide that enforcement of the restrictions may be brought by the developer (referred to as declarant in the CC&Rs), its successors or assigns, or the owners of any portion of the realty covered by the CC&Rs. The power to approve or disapprove residential building plans is vested, under the CC&Rs, in an architectural committee.

In 1987 Smiths submitted plans to the architectural committee, seeking approval of same in order to construct a residence. The plans received ultimate approval by the committee in October of 1987, and construction commenced soon thereafter. In January of 1988 a member of the architectural committee visited the construction site and concluded the structure was not being built in accordance with the approved plans. Letters subsequently were sent demanding a cessation of construction. A complaint for temporary and permanent injunctive relief was filed in February 1988. A temporary injunction halting construction was issued on February 2, and was confirmed by a preliminary injunction issued April 1, 1988. The preliminary injunction restrains Smiths from any construction activity which is inconsistent with the plans approved by the architectural committee. Smiths appeal from the order imposing the preliminary injunction.

Smiths attack the trial court order on the sole ground that the plaintiff has no standing to sue.[1]

DISCUSSION

 The plaintiff, B.C.E. Development, Inc. (BCE), brings the action as the successor in interest to La Costa Land Company, the original declarant. Smiths contend that neither the original developer nor its successor in interest is entitled to enforce the CC&Rs, notwithstanding the specific provision for enforcement contained in the CC&Rs themselves. The developer lost the right to enforce the CC&Rs, it is claimed, because it transferred all of the land in the development to third parties. Smiths cite as black letter law the proposition that one who imposes reciprocal land covenants retains the right to enforce the same only so long as he continues in ownership of some of the land benefited by the covenants. It is conceded that BCE owns no property in the development.

Smiths refer to considerable authority for this contention, a selection of which is cited for purposes of illustration as follows. Volume 4 Witkin, Summary of California Law (9th ed. 1987) Real Property, section 503, page 681 states: "Restrictions on use of land are unenforceable by a party who does not own any of the property intended to be benefited." Miller & Starr state that "the rights of enforcement can be reserved by the subdivider-grantor during such time as he retains the ownership of some part of the dominant tenement." (4 Miller & Starr, Cal. Real Estate (1977) § 25.10, p. 183.) In 13 Biel, California Real Estate Law and Practice, section 470.79, pages 470-43, 470-44, the proposition is stated more explicitly as follows: "The developer can retain the right to enforce restrictive covenants only so long as he or she retains property in the restricted area. Where a project is being developed in stages and the developer holds no interest in any lots in the first stage which are benefited by restrictions, the fact that he or she owns lots in later development stages does not give him or her the right to enforce restrictive covenants in the first stage. [Fns. omitted.]" The prelimi-

---

[1] Smiths originally raised two issues on appeal: not only that the plaintiff, BCE, had no standing to sue, but also that even assuming a successor in interest to or an assignee of the declarant would have standing to sue, it had not been established by competent evidence that BCE was either a successor in interest or assignee. We were advised at the time of oral argument that subsequent trial proceedings had clarified certain factual matters, and as a result the appellant withdrew at the time of oral argument its objections to the evidentiary showing at the hearing for the temporary injunction. It is now stipulated (and we accept as established for purposes of appeal): (1) BCE is the successor in interest to La Costa Land Company, the original declarant; (2) the architectural committee which reviewed Smiths' plans and inspected and disapproved his construction was appointed by BCE; (3) At no time of consequence in these matters (i.e., when BCE first appointed the architectural committee or at any time since) was BCE an owner of any real property in the tract subject to the covenant.

nary statement of the proposition in Annotation (1973) 51 A.L.R.3d 556, in the extensive comment, Who May Enforce Restrictive Covenant or Agreement as to Use of Real Property, includes the recitation that "generally, a restrictive covenant can be enforced only by the owner of some part of the dominant land for the benefit of which the covenant was made," and that a failure to demonstrate an ownership interest will show that such party "has no interest in the covenant and is a mere intruder." (*Id.* at pp. 586-587.)

■ An understanding of the above-recited principle is aided by a brief review of the law of covenants running with land. Enforcement of mutual covenants may be achieved by successors in interest to original interests, i.e., individuals who were not parties to the original agreement upon which the covenant was imposed, because the covenant becomes appurtenant to the land with reference to which it was created. (Civ. Code, §§ 1460, 1468; 4 Witkin, Summary of Cal. Law (9th ed. 1987) Real Property, § 486, p. 663.) In order to establish the binding effect of such covenant upon subsequent landowners, it is necessary that certain essential requisites be met. One of these is that the covenant must "touch or concern the land," meaning that it must relate to the use of both the benefited and burdened land. (4 Witkin, *supra,* § 488, pp. 665-666.) This requirement presumptively cannot be met when the party seeking enforcement of the covenant has no land to be benefited.

■ Agreements restricting land use may be enforced, even though not meeting all the requisites of a common law covenant running with the land, by classifying them as equitable easements or servitudes, enforceable by injunctive relief in equity. (4 Witkin, Summary of Cal. Law, *supra,* § 493, pp. 670-671.) As stated in *Richardson* v. *Callahan* (1931) 213 Cal. 683, 686 [3 P.2d 927]: "The marked tendency of our decisions seems to be to disregard the question of whether the covenant does or does not run with the land and to place the conclusion upon the broad ground that the assignee took with knowledge of the covenant and it was of such a nature that when the intention of the parties coupled with the result of a failure to enforce it was considered, equity could not in conscience withhold relief." ■ It appears that the complaint in this case relies upon the California doctrine of equitable servitude enforcement rather than compliance with the strict requirements of covenants running with the land.[2]

Smiths contend, however, that assuming we deal with an equitable servitude, it is nevertheless incumbent upon the plaintiff to demonstrate a

---

[2] The form of the complaint does not track the four elements required for a pleading of a traditional covenant running with the land, but rather reviews the establishment of the land restrictions by declaration filed by the subdivider, relying upon the equitable remedies of declaratory and injunctive relief.

present ownership in benefited land, citing *Young* v. *Cramer* (1940) 38 Cal.App.2d 64 [100 P.2d 523] and *Kent* v. *Koch* (1958) 166 Cal.App.2d 579 [333 P.2d 411]. *Young* v. *Cramer* relied upon language contained in a 1911 California Supreme Court case that " '[i]t is not open to question that building restrictions of the kind contained [in this case] are valid and enforceable at the suit of the grantor so long as he continues to own any part of the tract for the benefit of which the restrictions were exacted.' " (*Firth* v. *Marovich* (1911) 160 Cal. 257, 260 [116 P. 729], quoted in *Young* v. *Cramer, supra,* at p. 67.) *Young* v. *Cramer* involved building restrictions which were to be enforced by a right of reverter, retained by the trustee of a development trust. The plaintiff had obtained a fractional ownership interest in the right of reverter by conveyance from the trustee. The court denied the claim on the ground that plaintiff owned no land in the subdivision and that the fractional interest in the right of reverter, standing by itself, constituted no interest in realty. (38 Cal.App.2d at pp. 68, 69.)

*Kent* v. *Koch, supra,* 166 Cal.App.2d 579, was an effort by a developer to enforce covenants it had imposed on one subdivision unit after it had sold all lots in the unit. The developer contended it had standing by virtue of its continued development of adjacent stages in the development which were subject to the same covenants. The court denied enforcement upon a finding that the covenant in question related only to the lots in the first stage of development and therefore could be enforced only by landowners of those units.

We take no issue with the holdings in either of these cases. ▉ We conclude, however, that the talisman for enforcement is not the rigid requirement of retention of an interest in land, but rests instead upon a determination of the *intention* of those creating the covenant. Ordinarily it is quite true that parties to reciprocal land covenants will intend enforcement only by those who have an interest in the subject land, for otherwise, as stated in the comment in American Law Reports, third edition, the person lacking interest is a mere intruder. The comment continues, however, to explain that there may be cases in which land ownership by the enforcer may not be required, citing as an example the use of homeowners' associations as a modern device for enforcement. (Annot., *supra,* 51 A.L.R.3d at p. 587.)

California confirmation of this concept is found in *Russell* v. *Palos Verdes Properties* (1963) 218 Cal.App.2d 754 [32 Cal.Rptr. 488]. It was there held that a homeowners association granted enforcement rights by the development's declaration of land restrictions had standing to bring an enforcement action, notwithstanding that it owned no realty in the covenant area. The court found that the land covenant caused the association to become a

beneficiary of rights granted to all landowners, and thereby to have an equitable interest in the land sufficient to justify its enforcement action.[3]

The landmark case in California on the subject of equitable servitudes, *Werner* v. *Graham* (1919) 181 Cal. 174 [183 P. 945], emphasized the importance of determination of the parties' intent in the original deed restrictions. Subsequent authorities dealing with servitude enforcement procedures find a requirement of land owning in the party seeking enforcement not because such is an absolute condition, but because that is found to be the intent of the restriction. In *Young* v. *Cramer, supra,* 38 Cal.App.2d 64 (where the plaintiff succeeded to an interest in reversion but held no land subject to the covenant), the result was reached by a reading of the provisions of the deed and a determination therefrom that the parties *intended* an equitable servitude enforceable only by owners of lots in the tract. In *Kent* v. *Koch, supra,* 166 Cal.App.2d 579 (where a subdivider of successive tracts was precluded from enforcement of tract number one restrictions when it had sold all its lots in the tract), the decision rested on a construction of the agreement imposing restrictions. "A mere perusal of said agreement shows that it did not intend to make the restrictions for the benefit of any property other than that referred to in it, namely, the lots shown on the map of subdivision 1." (*Id.* at p. 583.)[4]

 The La Costa Land Company CC&Rs are clear in their allocation of rights to the declarant. Land use decisions are to be made by the architectural committee. The committee is to be appointed by the declarant, and may be modified by the declarant. This power remains until the "Declarant [shall], . . . at its option, relieve itself of the obligation of appointing . . . ." (Art. VIII, §§ 8 and 10 of the declaration.) The right to enforce the declaration is vested in the "Declarant, its successors or assigns, or the owners of any portion of said property . . . ." (Art. XII, § 1 of the declaration.) No limitation is imposed upon action by the declarant in terms of its

---

[3] See also *Cohen* v. *Kite Hill Community Assn.* (1983) 142 Cal.App.3d 642 [191 Cal.Rptr. 209], in which the current importance of homeowner associations in the enforcement of mutual covenants is recognized, the association in that case being held liable to homeowners for *failure* to take enforcement action, even though it was, of course, not a landowner in the development.

[4] *Trahms* v. *Starrett* (1973) 34 Cal.App.3d 766 [110 Cal.Rptr. 239], although cited by the trial court as controlling authority, does not appear to us directly in point. Here the court assumed in dictum that the developer retained enforcement rights, but did not note whether the developer continued in ownership of any land in the subdivision. Similarly, *Shields* v. *Bank of America* (1964) 225 Cal.App.2d 330 [37 Cal.Rptr. 360] adds little to our analysis. The right to cause reverter upon violation of land restrictions was upheld even though the holder of the right owned no land, upon the conclusion that rights of reentry and reverter need not be appurtenant to any land. Because *Shields* related to a right of reverter (as opposed to equitable enforcement by injunction) and an individual lot restriction (as opposed to a uniform plan of mutual covenants throughout a subdivision), its conclusions are of little use in this case.

continued ownership of land. Indeed, if only landowners could take enforcement action, it would have been unnecessary to specify in the CC&Rs that enforcement could be undertaken by the declarant *or* the owners of land.

This being an equitable action, it is appropriate to consider factors beyond the mere letter of the documentation. Recent times have seen increased development of multi-residential units which are interrelated. Condominium construction introduced the concept of common space dividers, both vertical and horizontal. Open as well as communal space reserved for the common use of tract residents became a typical benefit of developments, both in the form of condominiums and separated dwelling unit tracts. Private internal roads and gated entrances gave rise to the necessity of guards and maintenance personnel for the service of all residents of the development. Regulation of the rights, *inter se,* of the residents could be achieved, and assured, only by the adoption of highly detailed and specific regulations, imposed on initial buyers and successors in interest alike by the use of recorded mutual agreements. That these agreements were intended *not* to be restricted by old common law formulae is illustrated by their typical name: "Covenants, Conditions and Restrictions." Rather than using rights of reverter, which constitute a drastic and cumbersome form of remedy, the CC&Rs typically provide for enforcement by way of injunction.

Injunctive relief requires a court action. Typically, the interest in enforcing restrictions will be common to most, if not all, members of the community. Requiring individual landowners to shoulder the burden of enforcement litigation would be unreasonable. The administration of the common areas in the development is typically allocated to a homeowners association, or to some other entity constituted to represent all of the owners. Often at the inception of the development the enforcement entity is created and controlled by the developer of the project. It is highly reasonable in these circumstances that the representative association or other central agency undertake, on behalf of all homeowners, such litigation as may be required to enforce the CC&Rs. Where the clear intent of the CC&RS is to vest enforcement powers in an enforcement agency, there is no reason to further condition such enforcement powers upon the retention by the enforcement agency of land ownership in the development.

We note that this is not a case in which a developer is shown to have retained unreasonable or imperious control over artistic decisions of homeowners long after having completed the subdivision. Equity might well decline to enforce such asserted control, especially if it were shown to be contrary to the then desires of the homeowners. That is not this case. Under the provisions for amendment of the declaration the homeowners at any

time, by the vote of two-thirds of their members, could have ousted the developer's designated enforcement agency and substituted their own committee. In accordance with Civil Code section 1356 (part of the Davis-Stirling Common Interest Development Act) the homeowners since 1985 could have petitioned for the right to amend their declaration by a vote of only a plurality of their members. The homeowners in this subdivision having permitted the continuance of the architectural committee named by BCE, and having tolerated BCE's administration, for apparently many years following completion of the subdivision, it may be inferred that they have ratified the continuance of the status quo.[5]

In this case no issue is made of the validity of the CC&Rs. They are land use restrictions which (insofar as the record discloses) are reasonable in all regards, were imposed in accordance with law, and constitute enforceable equitable servitudes both benefiting and burdening each lot in the subdivision. While the Smiths were not original parties to the CC&Rs, they acquired title with notice of same and are bound by the CC&Rs. The most logical enforcement entity for policing the CC&Rs is the entity created for that purpose in the declaration itself—the declarant or its successor in interest. Having accepted title subject to this condition, Smiths are not now in a position to complain that enforcement in accordance therewith is inequitable. The trial court was correct in holding that the CC&Rs could be enforced by action of the entity so designated in the declaration, even though that entity owned no land in the subdivision.

The judgment of the trial court is affirmed. Respondent is entitled to costs on appeal.

Wiener, Acting P. J., and Benke, J., concurred.

---

[5] A somewhat similar situation was encountered in *Weston* v. *Foreman* (1952) 108 Cal.App.2d 686 [239 P.2d 513]. Developers of a multi-lot subdivision had named an architectural committee to administer approval of building plans, naming three individuals specifically. The recorded declaration provided that these individuals would serve until a designated date, at which time the then owners of a majority of the lots in the subdivision could designate a replacement committee. That date came and passed, and the original committee continued to act. The court found the committee to have retained the power originally vested in it, notwithstanding the passage of its termination date, because to do otherwise would create a period of time without effective enforcement means, and also the lack of redesignation of the committee suggested that "the purchasers were well satisfied with the work on the committee. . . ." (*Id.* at p. 693, fn. 2.)