232 P.3d 1147 (2010)
LAKEWOOD RACQUET CLUB, INC., a Washington corporation, Appellant,
v.
Mary Margaret JENSEN; A. Dwight Orr, Jr.; and Michael Scott Orr; being the heirs of A.D. Orr and Margaret Orr, deceased, Respondents.
No. 38906-1-II.
Court of Appeals of Washington, Division 2.
May 18, 2010.
*1148 Steven Leonard Larson, Attorney at Law, Scott David Winship, Vandeberg Johnson & Gandara, Tacoma, WA, for Appellant.
Clayton Arthur Hill, The Gosanko Law Firm, Mercer Island, WA, Heidi Moldenhauer York, The York Law Firm PLLC, Seattle, WA, for Respondents.
PENOYAR, J.
¶ 1 In 1962, A. Dwight Orr, Sr. sold about ten acres of undeveloped land near his family's home to the Lakewood Racquet Club. Covenants in the real estate contract and fulfillment deed forbid the Club from subdividing, building residences, or using the land for any purpose besides a "tennis, swimming, and squash club" without the consent of Orr or his heirs. In 1976, Orr's heirs sold the remaining family property to third parties. In 2007, the Club sued Orr's heirs after they withheld consent to the Club's plan to build 24 residences on the ten acres. The trial court declared that the restrictive covenants were valid and enforceable. We reverse and remand for entry of a declaratory judgment that Orr's heirs lack standing to enforce the covenants.

FACTS
¶ 2 In 1939, Orr purchased about 45 acres of land in present-day Lakewood (Orr property). Orr lived in the historic Boatman-Ainsworth house on the property with his wife Margaret,[1] and his three children, A. *1149 Dwight, Jr., Mary, and Michael. In the 1950s, Orr sold two tracts of land from the southern portion of the property to third parties.[2] Those properties now contain single-family homes.
¶ 3 In 1962, James Griffin and other local tennis players incorporated Lakewood Racquet Club. The Club's primary objective was to make tennis available year round in Pierce County. Orr's children had played high school tennis, and Orr supported the Club's objective. Orr agreed to sell about 10 acres in the northeastern portion of the Orr property to the Club for $30,000.
¶ 4 On May 16, 1962, Orr and the Club signed a real estate contract with the following restrictive covenants, which Orr insisted on:
This land and the improvements to be placed thereon shall be used for the purposes of a tennis, swimming, and squash club, and shall be used for no other purpose. No residence shall be erected thereon other than a dwelling and outbuilding for the use of a caretaker, nor shall the land be subdivided and sold in tracts, without the consent of the sellers, their heirs, and assigns.
Clerk's Papers (CP) at 42. That same day, Orr executed a statutory warranty deed that transferred title to the Club for about 3 acres, which allowed the Club to obtain financing for improvements. In 1964, Orr executed another statutory warranty deed that transferred title to the Club for another portion of the property.
¶ 5 Orr died in 1967, and the family sold the BoatmanAinsworth house four years later. On April 24, 1973, Orr's children, A. Dwight, Jr., Mary, and Michaelas joint trustees of Orr's testamentary trustand Orr's wife Margaret executed a fulfillment deed that transferred the balance of the property to the Club. This deed contained restrictions identical to those in the real estate contract and noted that such "covenants and restrictions shall run with the land hereby conveyed and shall be binding upon the Grantee herein named, its successors and assigns."[3] CP at 49-50. In 1976, the family sold the remaining Orr property to CHG International, which built single family homes on the property.
¶ 6 Over the years, the Club constructed six outdoor tennis courts, four indoor tennis courts, a clubhouse, a swimming pool, a fitness facility, a pro shop, an office, and on-site parking. These facilities occupy approximately 50 percent of the Club's property. In 2005, the Club's Board adopted a master plan to construct 24 townhomes/condominiums on its property. The Board planned to use revenues from the residential development to renovate and expand the Club's existing facilities.[4]
¶ 7 The Club asked Orr's two surviving children,[5] A. Dwight, Jr. and Mary, to sign a "Relinquishment and Release of Restrictive Covenants," but they declined. CP at 108. Mary apparently lives in Nevada. During the lawsuit, Mary assigned[6] her interest in the restrictive covenants to her daughter Chris Jensen, who also apparently lives in Nevada. A. Dwight, Jr. continues to live in Pierce County. CP at 109. The record does not reveal where Michael's son, Michael Scott Orr, lives. We refer collectively to A. *1150 Dwight, Jr., Chris Jensen, and Michael Scott Orr as "Orr's heirs."[7]
¶ 8 On April 25, 2007, the Club filed a complaint for declaratory and injunctive relief. The Club asked the trial court to enter a declaratory judgment that Orr's heirs lost standing to enforce the covenants when they sold the remaining Orr property in 1976. Subsequently, the Club moved for summary judgment.
¶ 9 In opposing the summary judgment motion, A. Dwight, Jr. and Mary submitted declarations stating that, as Orr's adult children, they actively participated in Orr's decision to sell the property to the Club in 1962. According to them, Orr did not want the Club's 10-acre property "used for land development, land speculation or sprawling multi-unit housing." CP at 107, 112. Rather, Orr negotiated the restrictive covenants in order to provide "an area for public recreation and an open space preserve for future generations." CP at 112.
¶ 10 On February 22, 2008, the trial court denied the Club's summary judgment motion. In a short oral ruling, the trial court stated that Orr's heirs' intent was "reasonable, appropriate, [and] articulate in the covenants," and it noted that the covenants constituted a reasonable restraint on alienation. CP at 214.
¶ 11 On March 17, 2008, Orr's heirs filed an amended answer with two counterclaims. They sought a declaratory judgment that the covenants remained valid and damages for the Club's breach or anticipatory repudiation of the restrictive covenants. Orr's heirs moved for declaratory judgment, which the trial court granted on February 13, 2009. The trial court's amended order, issued in April, stated that the restrictive covenants were "valid and enforceable." CP at 378. The trial court did not rule on Orr's heirs' claim for damages.
¶ 12 The Club appeals. The Club seeks review of the trial court's declaratory judgment and its order denying the Club's motion for summary judgment.

ANALYSIS

Standing to Enforce Restrictive Covenants
¶ 13 The Club presents three interrelated arguments that Orr's heirs lack standing to enforce the covenants. First, the Club argues that Orr's heirs lack standing under the Uniform Declaratory Judgment Act (UDJA)[8] because they will not suffer an "injury in fact" if the covenants are invalidated. Appellant's Br. at 13. Second, the Club contends that the common law of property does not permit covenantees to enforce restrictive covenants once they have sold the benefited property. Finally, the Club asserts that Orr's heirs have no right to enforce the covenants under the Restatement (Third) of Property: Servitudes (2000) because their benefit is appurtenant to the Orr property rather than being held "in gross." Appellant's Br. at 19. We agree that Orr's heirs lack standing to enforce the covenants because they sold the benefited property.

A. Standard of Review
¶ 14 A trial court's determination about a party's standing to enforce a restrictive covenant is a conclusion of law that we review de novo. See Mack v. Armstrong, 147 Wash.App. 522, 527, 195 P.3d 1027 (2008). Restrictive covenants are enforceable promises relating to the use of land. Viking Props., Inc. v. Holm, 155 Wash.2d 112, 119, 118 P.3d 322 (2005). Covenants are useful "because they create land-use arrangements that remain intact despite changes in ownership of the land." Lake Limerick Country Club v. Hunt Manufactured Homes, Inc., 120 Wash.App. 246, 252, 84 P.3d 295 (2004) (quoting Restatement (Third) of Property: Servitudes § 1.1 cmt. a at 9 (2000)). Because restrictive covenants derogate an owner's common law right to use land for all lawful purposes, however, we will not extend them to any use not clearly expressed. Riss v. Angel, 131 Wash.2d 612, 621, 934 P.2d 669 *1151 (1997). Our primary objective in interpreting a restrictive covenant is ascertaining the intent of the original parties to the covenants. Viking Props., 155 Wash.2d at 120, 118 P.3d 322. In determining intent, we give language its ordinary and common meaning. Riss, 131 Wash.2d at 621, 934 P.2d 669. We resolve any doubts in favor of the free use of land. Riss, 131 Wash.2d at 621, 934 P.2d 669.
¶ 15 We review an order of summary judgment in a declaratory judgment action de novo. McNabb v. Dep't of Corrs., 163 Wash.2d 393, 397, 180 P.3d 1257 (2008). We consider facts and reasonable inferences in the light most favorable to the nonmoving party, and we review all questions of law de novo. Hollis v. Garwall, Inc., 137 Wash.2d 683, 690, 974 P.2d 836 (1999).

B. Timeliness
¶ 16 As a preliminary matter, we note that Orr's heirs' counsel originally asserted that the Club failed to preserve the standing issue for review because the Club did not appeal the trial court's order denying its summary judgment motion. At oral argument, however, Orr's heirs' counsel acknowledged that this argument was "misguided."[9] Oral Argument (Jan. 7, 2010) at 16:35. We note that an order denying summary judgment is generally not an appealable "final judgment" under RAP 2.2(a)(1) whereas a declaratory judgment is an appealable "final judgment." DGHI Enters. v. Pac. Cities, Inc., 137 Wash.2d 933, 949, 977 P.2d 1231 (1999); Wooh v. Home Ins. Co., 84 Wash. App. 781, 783-84, 930 P.2d 337 (1997).

C. Uniform Declaratory Judgment Act
¶ 17 The Club argues that Orr's heirs lack standing under the UDJA. Our jurisdiction under the UDJA is limited to justiciable controversies, which involve:
(1) ... an actual, present and existing dispute, or the mature seeds of one, as distinguished from a possible, dormant, hypothetical, speculative, or moot disagreement, (2) between parties having genuine and opposing interests, (3) which involves interests that must be direct and substantial, rather than potential, theoretical, abstract or academic, and (4) a judicial determination of which will be final and conclusive.
Branson v. Port of Seattle, 152 Wash.2d 862, 877, 101 P.3d 67 (2004) (emphasis omitted) (quoting To-Ro Trade Shows v. Collins, 144 Wash.2d 403, 411, 27 P.3d 1149 (2001)). The traditional limiting doctrines of standing,[10] mootness, and ripeness inhere in these four requirements. To-Ro Trade Shows, 144 Wash.2d at 411, 27 P.3d 1149. The purpose of these doctrines is to ensure that we render a final judgment on an actual dispute between opposing parties that have a genuine stake in the resolution. To-Ro Trade Shows, 144 Wash.2d at 411, 27 P.3d 1149.
¶ 18 To have standing under the UDJA, a party must (1) fall within the zone of interests that the statute in question protects or regulates and (2) have suffered an "injury in fact." Am. Legion Post No. 149 v. Dep't of Health, 164 Wash.2d 570, 593-94, 192 P.3d 306 (2008) (quoting Grant County Fire Prot. Dist. No. 5 v. City of Moses Lake, 150 Wash.2d 791, 802, 83 P.3d 419 (2004)). The Club concedes that Orr's heirs satisfy the UDJA's zone of interests test because they are "person[s] interested under a deed." Appellant's Br. at 13 (quoting RCW 7.24.020). The Club argues, however, that, even if it were to violate the covenants by subdividing the property or engaging in a non-permitted use, Orr's heirs would suffer no "injury in fact" because they would not incur "actual damages." Appellant's Br. at 13-14.
¶ 19 We must address whether Orr's heirs continue to have the right to enforce the covenants before we can determine whether Orr's heirs would suffer an "injury in fact" *1152 under the UDJA if the trial court did not enforce the covenants. If, as the Club claims, covenantees cannot enforce restrictive covenants once they relinquish ownership in the benefited property, then it follows that such covenantees would not suffer an "injury in fact" if the covenants were violated.

D. Standing Under the Common Law and the Restatement
¶ 20 The Club's standing argument raises an issue of first impression in Washington. The question before us is whether an original covenantee, such as A. Dwight, Jr., may enforce restrictive covenants against an original covenantor, such as the Club, when the covenantee no longer owns property that the covenants benefit. We find that Orr's heirs cannot enforce the covenants because they no longer retain an ownership interest in the benefited property and therefore have no justiciable interest[11] in enforcing the covenants.
¶ 21 Other states' case law suggests that covenantees should not be able to enforce covenants once they divest their ownership interest in the benefited property. For example, in Shaff v. Leyland, 154 N.H. 495, 914 A.2d 1240, 1242-43 (2006), the original covenantee owned and lived on 75 acres of land. Over the years, she sold portions of the 75 acres to various parties, including a 23-acre parcel to the covenantor with the following covenants in the deed:
The above described premises are conveyed subject to the restriction, which shall run with the land, that the Grantees, their heirs and assigns shall construct on said premises only a colonial-type residence having a market value of at least One Hundred Thousand Dollars ($100,000).
Shaff, 914 A.2d at 1243. The covenantee eventually sold the rest of her 75 acres and retained no land interest near the burdened 23-acre parcel. Shaff, 914 A.2d at 1243. The court held that the covenantee had no standing to enforce the covenant "because she no longer owns land that benefits from it." Shaff, 914 A.2d at 1245. The court articulated the common law rule "that a person [must] own land that benefits from the restriction in order to have standing to enforce it." Shaff, 914 A.2d at 1244. The Shaff court also rejected the covenantee's argumentsimilar to an argument by Orr's heirs, raised belowthat the Restatement (Third) of Property: Servitudes required a different outcome. 914 A.2d at 1245. The court rejected this argument because the benefit was personal to the covenantee and did not run with the land. Shaff, 914 A.2d at 1245.
¶ 22 Similarly, in Waikiki Malia Hotel, Inc. v. Kinkai Props. Ltd. P'ship, 75 Haw. 370, 862 P.2d 1048, 1053-55 (1993), a covenantee's successor sued to enforce a deed's building height restrictions. The court held that the covenantee's successor could not enforce the height restrictions because the successor did not "own any land which the height restriction could benefit." Waikiki Malia Hotel, 862 P.2d at 1059. Other courts have reached similar conclusions. See, e.g., Kent v. Koch, 166 Cal.App.2d 579, 333 P.2d 411, 417 (1958) (developer of subdivision lacked standing to enforce covenant that it placed in recorded declaration where it had sold all lots in subdivision); Rogers v. State Rds. Comm'n, 227 Md. 560, 177 A.2d 850, 852 (1962) (a covenantee's continued ownership of benefited land in the vicinity of land subjected to the restriction was sufficient to give covenantee standing to enforce); McLeod v. Baptiste, 315 S.C. 246, 433 S.E.2d 834, 835 (1993) (original covenantee lacked standing to enforce architectural design covenants because it no longer owned any real property that would benefit from the covenants enforcement).
¶ 23 Courts often do not explain their rationale for following this rule. Professor Joseph Singer of Harvard Law School has noted that:
Covenants that restrict land use interfere with both the right of free use of property and the marketability of the property. *1153 This cost is thought to be justified if there is a sufficient compensating benefit; when neighboring land is benefited, there is a presumption that the burden to the servient estate is more than offset by the benefit to the dominant estate. But when the benefit is held by someone who has no interest in land benefited by the restriction, the presumption falls away. Even though the promisee wishes to enforce the promise against the owner of the servient estate, most courts will not allow the promisee to do so, in most circumstances, even if the original covenanting parties intended this result.
Joseph William Singer, Introduction to Property 263 (2d ed. 2005) (footnotes omitted). Professor William Stoebuck agrees with this rule: "If the covenantee has conveyed his land, so that the benefit of the promise has run to his grantee, the covenantee generally loses the right to enforce the covenant on any theory, so that the covenantor or his privy is liable only to the covenantee's grantee." William B. Stoebuck, Running Covenants: An Analytical Primer, 52 Wash. L. Rev. 861, 887 (1977) (citing Restatement of Property §§ 549, 550 (1944)).
¶ 24 Orr's heirs also argue that they hold the benefits of the restrictive covenants "in gross" and should be permitted to enforce them under section 8.1 of the Restatement (Third) of Property: Servitudes. That section permits beneficiaries of the covenant in gross to enforce the covenant if they have a "legitimate interest in enforcing the covenant," regardless of whether they still own the benefited land.[12]
¶ 25 Similarly, Orr's heirs cite a single Texas case for the proposition that "the original grantor of a deed containing restrictive covenants could enforce them, even when it no longer owned neighboring parcels." Resp't's Br. at 15 (citing Voice of the Cornerstone Church Corp. v. Pizza Prop. Partners, 160 S.W.3d 657 (Tex.App.2005)). In Cornerstone Church, Mobil Oil entered into a binding settlement agreement and an agreed order with the Texas Water Commission in 1992 because of past environmental contamination on its property. 160 S.W.3d at 662. Under the order, Mobil Oil and its successor, ExxonMobil, had continuing obligations to remediate pollution and to prohibit uses of the property that could create environmental risks. 160 S.W.3d at 662, 666. Thus, when Mobil Oil sold the property, it included restrictive covenants in the deed that prohibited non-industrial uses, including Cornerstone's church activities. 160 S.W.3d at 662. In the context of ExxonMobil's continuing obligations under the agreement with the Texas Water Commission, the court suggested that ExxonMobil held an easement in gross and could enforce the restrictions because its "rights do not attach to a dominant estate." 160 S.W.3d at 667. Cornerstone Church is inapposite here because Orr's heirs have no legal obligation to enforce the restrictive covenants. We decline to further address section 8.1 of the Restatement (Third) of Property: Servitudes because its application involves the rights of adjacent landowners who are not parties to this action.
¶ 26 We adopt a rule that covenantees may only enforce restrictive covenants if they have a justiciable interest in enforcement, generally an ownership interest in the benefited property. Orr's heirs point to no persuasive contrary authority. Moreover, such a rule does not interfere with the enforcement of consensual private land use arrangements as long as the benefited party still has a justiciable interest in enforcement.
¶ 27 Applying this rule here, we find that Orr's heirs do not have a justiciable interest in enforcing the covenants. Their personal opinions and desires about how the Club should use its property are simply insufficient to allow a court to restrict the Club's free use of its land.

E. Equity
¶ 28 Orr's heirs also encourage us to apply "equity and practical considerations" *1154 rather than "[r]igid black letter law regarding ownership of adjacent parcels." Resp't's Br. at 17. In making this argument, Orr's heirs rely heavily on B.C.E. Dev., Inc. v. Smith, 215 Cal.App.3d 1142, 264 Cal.Rptr. 55 (1989). In that case, the court held that a covenantee's successor in interest, who no longer owned any of the benefited land in the real estate development, could sue to enforce the decisions of the architectural committee under the covenants. B.C.E. Dev., Inc., 264 Cal.Rptr. at 56, 60. The B.C.E. court concluded that, "the talisman for enforcement is not the rigid requirement of retention of an interest in land, but [rather] a determination of the intention of those creating the covenant." 264 Cal.Rptr. at 58; see also Runyon v. Paley, 331 N.C. 293, 416 S.E.2d 177, 189 n. 3 (1992); Christiansen v. Casey, 613 S.W.2d 906, 910-12 (Mo.Ct.App.1981) (asserting that a developer should be able to enforce restrictions if that was the parties' intent even if the developer owns no adjacent land). The B.C.E. court noted that the developer, who was the original covenantee, specifically stated that the restrictions could be enforced by the developer's successors with no reference to land ownership. 264 Cal.Rptr. at 56, 60. Thus, the developer in B.C.E. had the enforcement role often granted to homeowners' associations or architectural committees under other development schemes.
¶ 29 Unlike B.C.E., the restrictions here grant enforcement power to the Orrs and their heirs only for themselves, not for any group or landowners or homeowners' association. Were they still nearby landowners, equity would likely recognize their right to enforce the restrictions. But for the same reasons that we find that Orr's heirs lack standing, we find that equity does not compel that they be allowed to enforce the restrictions. We therefore decline to exercise our equitable powers.
¶ 30 The essence of Orr's heirs' arguments, both in law and equity, is that freedom of contract principles should trump property law considerations. Certainly contract law gives individuals expansive powers to order their own affairs. But before a court will step in to restrict the free use of land, a plaintiff must demonstrate some justiciable harm. While we recognize the good intentions of Orr's heirs to preserve a natural open space in Lakewood, we may not restrict the free use of land based on good intentions alone. We reverse and remand for entry of a declaratory judgment that Orr's heirs lack standing to enforce the covenants.[13]
We concur: VAN DEREN, C.J., and HOUGHTON, J.
NOTES
[1] Orr's wife Margaret was a party to all of Orr's real estate transactions that are discussed in this opinion. Orr's children focus on their father's role in these transactions and, therefore, so do we. Additionally, to avoid confusion, we refer to Orr's family members by their given names. We intend no disrespect.
[2] The third parties are not relevant to this appeal.
[3] The 1976 fulfillment deed also stated that the covenants applied to those portions of the Orr property that Orr transferred to the Club by the 1962 and 1964 deeds.
[4] With regard to the Club's finances, a Board member reported at the July 23, 2007 Board meeting that "the numbers looked good." CP at 354. He stated that "[t]he balance due on the mortgage is now under $250,000. Dues income is up and expenses are on target." CP at 354. During litigation, Board members stated that the Club needed to renovate its facility in order to better appeal to its members, offer additional programs, and compete with other facilities.
[5] Orr's wife Margaret and his son Michael died at some point before the Club filed its lawsuit.
[6] Because the validity of Mary's assignment does not affect the resolution of the issues on appeal, we assume, without deciding, that the assignment was valid.
[7] "Orr's heirs" are the respondents on appeal and include one original grantor/covenantee (A. Dwight, Jr.), one heir (Michael Scott Orr), and one assignee (Chris Jensen).
[8] Chapter 7.24 RCW.
[9] At oral argument, counsel also asserted that Orr's heirs have standing because "standing was never meant to be a doctrine or a position that should be taken by plaintiffs offensively against defendants." Oral Argument (Jan. 7, 2010) at 16:39-16:48. Even assuming that this argument has merit, Orr's heirs became plaintiffs when they counterclaimed against the Club and moved for declaratory judgment.
[10] Our Supreme Court has noted that the requirements of standing and justiciability overlap under the UDJA. To-Ro Trade Shows, 144 Wash.2d at 411 n. 5, 27 P.3d 1149.
[11] We take care to explain what we mean by the phrase "justiciable interest." We are describing the stake that a covenantee must have in order to ask a court to legally enforce a covenant. We are not suggesting that Orr's heirs' motives are not legitimate or that they are not acting in good faith.
[12] Restatement (Third) of Property: Servitudes, section 8.1 states in full: "A person who holds the benefit of a servitude under any provision of this Restatement has a legal right to enforce the servitude. Ownership of land intended to benefit from enforcement of the servitude is not a prerequisite to enforcement, but a person who holds the benefit of a covenant in gross must establish a legitimate interest in enforcing the covenant."
[13] We note that the Club also argued in this appeal that the covenants are unreasonable restraints on alienation. Because we resolve this case on the issue of standing, we do not address this additional argument.