IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of: | ) | No. 37179-4-III |
| | ) | |
| That Portion of Lots 1 & 2, Block 1, | ) | |
| Comstock Park Second Addition, | ) | |
| According to Plat Recorded in Volume 2 | ) | |
| of Plats, Page 84, Situate in the City And | ) | |
| County of Spokane, Washington, Lying | ) | |
| Easterly of the Following Described Line: | ) | |
| Beginning at the Northwest Comer of Said | ) | |
| Lot 1; Thence N89°59'27"E, Along the | ) | |
| North Line of Said Lot 1, 11.00 Feet; | ) | |
| Thence S09°39' 47'W, Generally Along a | ) | |
| 6.0° Foot Board Fence, to the South Line | ) | |
| of Said Lot 2 and the Point of Terminus; | ) | |
| Except a Portion Thereof Described as | ) | PUBLISHED OPINION |
| Follows: Beginning at the Southeast Comer | ) | |
| of Said Lot 2; Thence Southwesterly Along | ) | |
| the Southerly Line of Said Lot 2 to the | ) | |
| Southwest Comer Thereof; Thence | ) | |
| Northerly Along the Westerly Line of Said | ) | |
| Lot 2 A Distance of 38.0 Feet; Thence | ) | |
| Northeasterly to the Point of Beginning; | ) | |
| | ) | |
| ALEX MAY, owner of said property, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SPOKANE COUNTY, necessary party; and | ) | |
| VICKY DALTON, SPOKANE COUNTY | ) | |
| AUDITOR, in her official capacity, | ) | |
| necessary party, | ) | |
| | ) | |
| Respondents. | ) | |

No. 37179-4-III
*May v. Spokane County*


PENNELL, C.J. — In 1948, the United States Supreme Court declared racially

discriminatory real estate covenants unenforceable under the Fourteenth Amendment

to the United States Constitution. *See Shelley v. Kraemer*, 334 U.S. 1, 23, 68 S. Ct. 836,

92 L. Ed. 1161 (1948). Despite this ruling, racist housing practices persisted for decades

and discriminatory language continued to be inserted into various real estate documents.[1]

Fair housing laws passed in the late 1960s[2] did much to halt real estate discrimination.

But vestiges of offensive and illegal practices continue to be reflected in various recorded

real estate instruments.

In 1987, the legislature added a new provision to Washington's Law Against

Discrimination, chapter 49.60 RCW. *See* LAWS OF 1987, ch. 56, §§ 1-2. Codified as

RCW 49.60.227, it provided a method for property owners, and later other interested

parties, to petition to strike racially discriminatory provisions from real property contracts.

The statute was passed out of a recognition that discriminatory language in real estate

documents is "repugnant to many property owners and diminishes the free enjoyment of

---

[1] *See* Thomas Shepard, *A Shadow of Ohio's Racist Past? Or a Lingering, Tangible Impact? An Examination of Unenforceable Restrictive Covenants*, 48 CAP. U. L. REV. 43, 43-44 (2020).

[2] Former 42 U.S.C. § 3604 (PUB. L. NO. 90-284, Title VIII, 82 Stat. 83 (Civil Rights Act of 1968, Fair Housing, Discrimination in the Sale or Rental of Housing)); Former RCW 49.60.222-.226 (LAWS OF 1969, 1st Ex. Sess., ch. 167 (Law Against Discrimination–Real Estate Transactions)).

their property." LAWS OF 1987, ch. 56, § 1.

Although RCW 49.60.227 is over 30 years old, it has received little judicial attention. At issue here is the novel question of what it means to "strike" racially discriminatory language under RCW 49.60.227. Must the offending language be physically and permanently removed from existing records? Or is it sufficient that a court order declares the language stricken, thereby removing the language as a matter of law? Our statutory analysis favors the latter approach. We therefore affirm the order of the superior court.

## FACTS

In 1953, William H. Cowles Jr. and John McKinley, executors of the estate of William Hutchinson Cowles, owned lots located in an area of Spokane known as "Comstock Park Second Addition." In August of that year, they recorded a declaration of protective covenants for all their lots, which remained undeveloped. These covenants bound all subsequent purchasers in the future residential neighborhood. The third of these covenants, provision (c), placed the following racial restriction in the recorded declaration:

> No race or nationality other than the white race shall use or occupy any building on any lot, except that this covenant shall not prevent occupancy by domestic servants of a different race or nationality employed by an owner or tenant.

Clerk's Papers (CP) at 34.

Sixty years later, Katherine Gregory conveyed her home, located within the

Comstock neighborhood at 3010 South Post Street, to Aaron and Sadie Lake. In a

statutory warranty deed recorded February 7, 2013, Ms. Gregory removed the language

referencing provision (c) from the deed by including the following bulleted item:

> SUBJECT TO:
> . . . .
>
> - Covenants, conditions, restrictions and/or easements; but deleting
>   any covenant, condition or restriction indicating a preference,
>   limitation or discrimination based on race, color, religion, sex,
>   handicap, family status, or national origin to the extent such
>   covenants, condition or restrictions violate Title 42, Section 3604(c),
>   of the United States Codes: Recorded: August 14, 1953. Recording
>   Information: 189339B.

*Id.* at 63. Despite Ms. Gregory's efforts, the 1953 declaration of covenants remained

recorded with no modification.

In 2017, the Lakes transferred the property by statutory warranty deed to Alex and

Alexandra May. The Lakes' deed conveying the property does not include the language

deleting the racial covenant found in the deed given to them by Ms. Gregory. The deed

merely states:

> Subject To: This conveyance is subject to covenants, conditions, restrictions
> and easements, if any, affecting title, which may appear in the public
> record, including those shown on any recorded plat or survey.

*Id*. at 38.

At the time of the conveyance from the Lakes, and today, the language in the 1953 declaration of restrictive covenants remains unaltered and within the public records of which the Spokane County Auditor's Office is custodian. When purchasing his home in September 2017, Mr. May became aware of provision (c) of the protective covenants during the title search of his property.

## PROCEDURE

On March 22, 2018, Mr. May initiated his declaratory judgment action in Spokane County Superior Court. The action eventually included both Spokane County and its elected auditor, Vicky Dalton (collectively the County), as parties. Mr. May sought to have the discriminatory restrictive covenant declared void and to "strike that same subsection from public record and eliminating it from the title of the property" as provided in RCW 49.60.227. *Id*. at 13. As part of his request for relief, Mr. May specifically sought "[e]ntry of a declaratory judgment that the voided Subsection C of the restrictive property covenant be removed from the covenant." *Id*. at 7. In the course of litigation, Mr. May explained his request would require physical alteration of the recorded

1953 covenants, though he did not identity a specific method of removing the offending language.

Mr. May brought a motion for summary judgment. The County contested the motion, relying on a declaration from Vicky Dalton. According to Ms. Dalton, documents in a chain of title are not to be physically altered once recorded. Even when a document is recorded in error, it is not destroyed. Instead, a corrected document is re-recorded. Ms. Dalton emphasized that the integrity of a property lot's chain of title is based on the indestructability of recorded documents in the custody of the local recording office.

The trial court denied Mr. May's summary judgment motion, holding that RCW 49.60.227 does not oblige county auditors to physically remove void provisions from the public record. The court further declared provision (c) of the 1953 declaration of protective covenants void under RCW 49.60.224 and that the provision was stricken by order of the court. The court directed a copy of the order be filed with the Spokane County Auditor's Office in the records for Mr. May's property.

ANALYSIS

This case raises the novel issue of how to interpret RCW 49.60.227, which authorizes courts to strike racially restrictive covenants from recorded real property contracts. Specifically, what does it mean for a court to order something stricken?

Must the records custodian go through the original record and physically excise void

provisions from the property record? Or is the court's order sufficient to serve as a

corrective document?[3]

"The meaning of a statute is a question of law reviewed de novo." *Dep't of*

*Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002). When tasked

with statutory interpretation, our goal is to carry out the legislature's intent. The best

source of that intent is the words chosen by the legislature. But words must not be viewed

in isolation. We must also consider context and related statutes. *Id*. at 10-11. If, viewed in

this light, a statute's meaning is plain on its face, it must be given that effect. Only if a

statute is truly unclear may we engage in statutory construction and look at interpretive

aids such as legislative history. *See id.* at 11-12.

The statute at issue here reads as follows:

> **Declaratory judgment action to strike discriminatory provision of real
> property contract—Restrictive covenant modification document as
> alternative.** (1)(a) If a written instrument contains a provision that is void

---

[3] The County's briefing focuses on the issue of statutory construction. However, the County also suggests Mr. May's claim for relief is moot because of the changes to the deed made by the former owner, Ms. Gregory. This suggestion is contrary to the rule that a property owner has no ability to remove a covenant when transferring property. *Lakewood Racquet Club, Inc. v. Jensen*, 156 Wn. App. 215, 222, 232 P.3d 1147 (2010). Further, Mr. May's claim is that he is entitled to physical redaction of the property record. This is not a remedy that was purported to be afforded by Ms. Gregory's 2013 deletion of the offending provision.

by reason of RCW 49.60.224, the owner, occupant, or tenant of the property which is subject to the provision or the homeowners' association board may cause the provision to be stricken from the public records by bringing an action in the superior court in the county in which the property is located. The action shall be an in rem, declaratory judgment action whose title shall be the description of the property. The necessary party to the action shall be the owner, occupant, or tenant of the property or any portion thereof. The person bringing the action shall pay a fee set under RCW 36.18.012.

(b) If the court finds that any provisions of the written instrument are void under RCW 49.60.224, it shall enter an order striking the void provisions from the public records and eliminating the void provisions from the title or lease of the property described in the complaint.

(2)(a) As an alternative to the judicial procedure set forth in subsection (1) of this section, the owner of property subject to a written instrument that contains a provision that is void by reason of RCW 49.60.224 may record a restrictive covenant modification document with the county auditor, or in charter counties the county official charged with the responsibility for recording instruments in the county records, in the county in which the property is located.

(b) The modification document shall contain a recording reference to the original written instrument.

(c) The modification document must state, in part:

"The referenced original written instrument contains discriminatory provisions that are void and unenforceable under RCW 49.60.224 and federal law. This document strikes from the referenced original instrument all provisions that are void and unenforceable under law."

(d) The effective date of the modification document shall be the same as the effective date of the original written instrument.

(e) If the owner causes to be recorded a modification document that contains modifications not authorized by this section, the county auditor or recording officer shall not incur liability for recording the document. Any liability that may result is the sole responsibility of the owner who caused the recordation.

(f) No filing or recording fees or otherwise authorized surcharges shall be required for the filing of a modification document pursuant to this section.

8

(3) For the purposes of this section, "restrictive covenant modification document" or "modification document" means a standard form developed and designed by the Washington state association of county auditors.

RCW 49.60.227. Of particular concern is subsection (1)(b), which authorizes courts to strike void provisions of racially restrictive covenants.

By its plain terms, the only action contemplated by subsection (1)(b) is the entry of a court order. The order in turn will do two things: (1) strike void provisions from the public record and (2) eliminate void provisions from the title or lease. Subsection (1)(b) of the statute does not authorize a judge entering the order to direct a public records custodian (such as a county auditor) to physically alter existing records. Indeed, subsection (1) does not contemplate a records custodian as a necessary party to the litigation—the only necessary party is "the owner, occupant, or tenant" of the property. RCW 49.60.227(1)(a). Read in isolation, subsection (1)(b) favors the County's position that a court order is self-executing and therefore does not require physical alteration of property records.

The related provision RCW 49.60.227(2) reinforces this interpretation of subsection (1)(b). Subsection (2) sets forth an alternate procedure whereby a property owner can avoid going to court to void a discriminatory provision in a recorded instrument. If this route is chosen, the legislature specifies that the property owner must

file a written modification document with specific wording: "The referenced original written instrument contains discriminatory provisions that are void and unenforceable under RCW 49.60.224 and federal law. *This document strikes from the referenced original instrument all provisions that are void and unenforceable under law.*" RCW 49.60.227(2)(c) (emphasis added). The wording in subsection (2)(c) clarifies that the legislature intended a legal document to do the act of "striking" discriminatory language. There is no need for a third party to take action to alter public records.

Given the legislature's explicit recognition in subsection (2) that a document itself serves to "strike" a discriminatory provision, it stands to reason that the same function was intended in subsection (1)(b). While subsection (1)(b) differs from subsection (2) in that subsection (1)(b) does not provide mandatory language to be used in a court order, this distinction is not material. Judges are accustomed to fashioning orders; lay people are not. It makes sense that the legislature would clarify exact language to be used by a lay person, but not the courts.

Mr. May concedes that subsection (2) contemplates that a remedial document will be self-executing. Nevertheless, he claims subsection (1) must have a different meaning, otherwise the two provisions would be redundant. According to Mr. May, the difference

10

between subsections (1) and (2) is that subsection (1) provides a broader remedy that actually involves physically altering existing records. We disagree with this assessment.

If the legislature had intended a court order issued under subsection (1) to have a broader impact than a modification document under subsection (2), it would have said so more clearly. Instead, the legislature used similar language, noting that both a court order and a modification document would "strike" invalid portions of a recorded instrument.

Reading RCW 49.60.227 as contemplating that court orders and modification documents are both self-executing does not render subsections (1) and (2) redundant. There are important differences:

- The court-facilitated remedy outlined in subsection (1) is available to a broad array of interested parties: the owner, occupant, tenant, or homeowners' association board. The alternate procedure outlined in subsection (2) is available only to property owners.

- The court-facilitated remedy outlined in subsection (1) is more authoritative than the alternate procedure outlined in subsection (2). The legislature recognized that a property owner filing a modification document under subsection (2) may misidentify a portion of a recorded instrument as void. *See* RCW 49.60.227(2)(e). Thus, even though a property owner can obtain

11

relief under subsections (1) and (2), and can avoid paying a filing fee under

subsection (2) (*see* RCW 49.60.227(2)(f)), the owner may want to obtain a

court order that will definitively lay out which portions of a recorded

instrument are, in fact, void.

Dictionary definitions of the terms used in RCW 49.60.227 support the conclusion

that the documents issued under subsections (1) and (2) are both intended to be self-

executing. The key word here is the verb "strike."[4] *Black's Law Dictionary*[5] defines

"strike" as "[t]o expunge." BLACK'S LAW DICTIONARY 1720 (11th ed. 2019). In defining

the verb "expunge," *Black's* further explains, "[s]omething expunged is noted in the

original record as expunged and is redacted from all future copies." *Id*. at 727. In other

words, when something is stricken or expunged, the original is not redacted or altered;

only the future copies are.

The idea that striking or expunging something does not entail physical destruction

or alteration of the original is consistent with our case law. *State v. Rushworth*, 12 Wn.

---

[4] Although RCW 49.60.227(1)(b) uses "striking" and "eliminating," subsection (1)(a) identifies the court action at issue in subsection (1)(b) as one that causes a racist provision "to be stricken from the public records."

[5] Because the term utilized by the legislature occurs in a legal context, it is appropriate to use a law dictionary. *See, e.g.*, *Cashmere Valley Bank v. Dep't of Revenue*, 181 Wn.2d 622, 634, 334 P.3d 1100 (2014) (using *Black's Law Dictionary* to define the "familiar legal term" "secured").

App. 2d 466, 472, 458 P.3d 1192 (2020) ("Striking evidence does not erase it from the record or hide it from the public; it properly eliminates the evidence from the jury's consideration or from an appellate court's subsequent assessment of evidentiary sufficiency."); *State v. Shineman*, 94 Wn. App. 57, 63-64, 971 P.2d 94 (1999) (When a criminal record is expunged "the records themselves need not be destroyed.").

Given the foregoing, RCW 49.60.227 plainly contemplates that a court order striking a voided provision in a recorded instrument is self-executing; i.e., no action beyond entry of the order is necessary to eliminate the existence of the discriminatory provision. This conclusion is consistent with existing practices of how corrections are made to property records, as set forth in the trial court declaration of the Spokane County auditor, Vicky Dalton.

Because the statute's meaning is clear, there is no need to look to tools of construction such as legislative history. Nevertheless, what little legislative history exists on this issue supports the foregoing interpretation. Specifically, while speaking before the Senate Financial Institutions, Housing & Consumer Protection Committee on the proposed amendment to the statute adding homeowners' association boards to the list of interested parties able to petition for the striking of discriminatory provisions in real property contracts, legislative staff member Jennifer Arnold stated that the language

allowing racially restrictive covenants to be stricken did not literally mean the documents could be destroyed; she opined that doing so would violate the Public Records Act, chapter 42.56 RCW. Hr'g on S.B. 6169 Before the S. Financial Institutions, Housing & Consumer Protection Comm., 59th Leg., Reg. Sess. (Wash. Jan. 19, 2006), at 17 min., 47 sec. through 18 min., 5 sec., *audio recording by* TVW, Washington State's Public Affairs Network, http://www.tvw.org.

By its plain terms, RCW 49.60.227 provides a method for repudiating racially restrictive covenants while still preserving the historical record and integrity of a property's chain of title. This balance makes good sense. Real estate documents with racially restrictive provisions are "offensive, morally reprehensible, and repugnant." *Mason v. Adams County Recorder*, 901 F.3d 753, 757 (6th Cir. 2018). But such documents are part of "our living history." *Id*. A policy of whitewashing public records and erasing historical evidence of racism would be dangerous. It would risk forgetting and ultimately denying the ugly truths of racism and racist housing practices. Such an outcome cannot be squared with the antidiscrimination purposes of Washington's Law Against Discrimination. *See* RCW 49.60.010.

No. 37179-4-III
*May v. Spokane County*

CONCLUSION

We agree with the trial court that an order striking a void covenant under

RCW 49.60.227(1)(b) is self-executing. While the order should be included as part of the

official property record, there is no additional need to physically alter existing records.

The judgment on appeal is affirmed.

_____
Pennell, C.J.

I CONCUR:

_____
Lawrence-Berrey, J.

15

No. 37179-4-III

FEARING, J. (dissent) —

*The ability to choose space and to move unimpeded through and across the local spaces of everyday life are basic components of freedom, social belonging, status, and dignity. Being excluded from space or marginalized within a particular space is stigmatizing and degrading. Racial territoriality demeans the individual by prohibiting the full expression of the self because those who suffer it experience the world as outsiders, barred from full participation in society.* Elise C. Boddie, *Racial Territoriality*, 58 UCLA L. Rev. 401, 420 (2010).

The Thirteenth Amendment to the United States Constitution promised an end to not only slavery, but the badges and incidents of slavery. *City of Memphis v. Greene*, 451 U.S. 100, 124-25, 101 S. Ct. 1584, 67 L. Ed. 2d 769 (1981); *Griffin v. Breckenridge*, 403 U.S. 88, 105, 91 S. Ct. 1790, 29 L. Ed. 2d 338 (1971); *Robertson v. Baldwin*, 165 U.S. 275, 292, 17 S. Ct. 326, 41 L. Ed. 715 (1897); *Civil Rights Cases v. Stanley*, 109 U.S. 3, 20-21, 3 S. Ct. 18, 27 L. Ed. 835 (1883); CONG. GLOBE, 39th Cong., 1st Sess. 1152 (1866) (statement of Rep. Thayer). But one hundred and fifty years later, rootlets, remnants, residues, remainders, and relics of bondage persist. This appeal concerns a lasting earmark of American slavery— the bar to contracting or owning real property. *Phiffer v. Proud Parrot Motor Hotel, Inc.*, 648 F.2d 548, 551 (9th Cir. 1980). As part of

this nation's enduring and endemic emblems of slavery, the ruling white caste impressed restrictive covenants on real property that excluded other races from owning and occupying favored land. Ghosts of these racial covenants continue to haunt the title to American real estate and trample the dignity of numerous ethnicities.

Employment of racially preclusive real property covenants began in the first half of the twentieth century after the United States Supreme Court ruled unconstitutional municipal zoning based on race. Denizens of white concentrated neighborhoods schemed to prevent racial integration from sullying the "high character" enjoyed in their pallid environs. White citizens feared that black neighbors would encourage civil unrest, spread infectious disease, and lower property values. So homeowner groups recorded, in public records, restrictive private agreements that relegated blacks to the inner city.

The government abetted in the erection of this wall of exclusion. In the 1930s, the Federal Housing Authority adopted regulations compelling the recording of racial covenants in order to maintain housing values on property, for which the federal government issued loan insurance. In turn, being curbed inside stigmatized zones limited Black populations' access to fresh food, good schools, health care, and other services and exposed Blacks to environmental hazards. These residential barriers created a scarcity of housing and inflated the prices paid by Blacks for homes. Lenders redlined downtown neighborhoods from receiving loans. Then the white race blamed African-Americans for ghettos and castigated Blacks for congregating in one location.

In the 1930s, Nazi Germany studied discriminatory practices and laws imposed against Blacks in the United States, including the widespread custom of real estate racial covenants, when drafting the Nuremberg laws that, in part, relegated Jews to ghettos. By that decade, racial home ownership restrictions not only infected the American South, but all regions of our nation. By the end of the 1940s, racial covenants blanketed over half of United States housing.

In 1948, the United States Supreme Court overruled earlier precedent that characterized court enforcement of racial restrictive covenants as entirely a private matter. In *Shelley v. Kraemer*, 334 U.S. 1, 68 S. Ct. 836, 92 L. Ed. 1161 (1948), the Court declared for the first time that court enforcement of an ethnically exclusive covenant on the ownership of property involved state action, and, therefore, a court could not enforce the restriction. The Supreme Court's decision applied throughout the nation.

Despite the ruling in *Shelley v. Kraemer*, the Estate of William Hutchinson Cowles, Sr., through its executors William Hutchinson Cowles, Jr. and John McKinley, imposed, in 1953, a racial restrictive covenant in Spokane's Comstock Park Second Addition subdivision. The covenant reads:

> No race or nationality other than the white race shall use or occupy any building on any lot, except that this covenant shall not prevent occupancy by domestic servants of a different race or nationality employed by an owner or tenant.

3

Clerk's Papers at 34. The covenant added degradation to damage. A nonwhite person could reside in the neighborhood, but only in a subservient role to white masters.

In 1953, the Cowles family was a leading family in Spokane. William Cowles, Sr., who died in 1946, was the former owner and publisher of Spokane's two newspapers, the *Spokane Daily Chronicle* and *The Spokesman-Review*. William Cowles, Jr. succeeded his father as publisher and part owner of the duet of Spokane papers. One might think that the publisher of a major newspaper would know of a United States Supreme Court ruling prohibiting enforcement of racial restrictive covenants, and one might hope that a pillar of eastern Washington's premier city would obey the ruling. Nevertheless, the prominent Spokanite imposed the illegal restraint on the ownership and use of property five years after *Shelley v. Kraemer*. Preserving property value prevailed over human equality and compliance with law.

The Comstock Park Second Addition restrictive covenant begs many questions as to its intended application such as who is a member of the "white race" and how does a court assess who is a member of this privileged in-crowd. See *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617-18, 107 S. Ct. 2019, 95 L. Ed. 2d 594 (1987); *Rice v. Gong Lum*, 139 Miss. 760, 104 So. 105, 110 (1925), *aff'd*, 275 U.S. 78, 48 S. Ct. 91, 72 L. Ed. 172 (1927); *In re Takuji Yamashita*, 30 Wash. 234, 236-38, 70 P. 482 (1902). Assuredly African-Americans did not fit the white higher caste.

This appeal does not concern the enforceability of the Comstock Park Second Addition language permitting only the white race to use or occupy a building, but rather poses a different question—whether a homeowner in the subdivision may, in 2021, force the Spokane County Auditor to purge from the owner's chain of title all references to the ethnic interdiction. In September 2017, appellant Alex May purchased a Spokane residence in William Hutchinson Cowles' Comstock Park subdivision. After reading the covenants, May demanded that the Spokane County Auditor Vicky Dalton erase the covenant from the public record. Dalton refused and told May to exercise alternative remedies.

The United States Constitution's Thirteenth Amendment, the United States Constitution's Fourteenth Amendment, the United States Supreme Court precedent of *Shelley v. Kraemer*, and Washington statutes authorize destruction of the unlawful covenant from the county auditor's records. I would grant the relief sought by Alex May to strike the covenant from the public record.

I first review Washington statutes. The Washington State Legislature, in 1969, declared the invalidity of racial restrictive property covenants in this state and proclaimed the insertion of the discriminatory provisions in real estate documents as an unfair practice. RCW 49.60.222. The legislature concluded "that such discrimination threatens not only the rights and proper privileges of inhabitants but menaces the institutions and

5

foundation of a free democratic state." RCW 49.60.010. The statute adopted in 1969,

RCW 49.60.224, now reads:

> (1) Every provision in a written instrument relating to real property
> which purports to forbid or restrict the conveyance, encumbrance,
> occupancy, or lease thereof to individuals of a specified race . . . [or] color
> . . . is void.
> (2) It is an unfair practice to insert in a written instrument relating to
> real property a provision that is void under this section or to honor or
> attempt to honor such a provision in the chain of title.

In 1987, the Washington Legislature added a statute that crafted a legal process for

declaring an unlawful racial covenant void. RCW 49.60.227, this appeal's key statute,

then proclaimed:

> (1)(a) If a written instrument contains a provision that is void by
> reason of RCW 49.60.224, the owner, occupant, or tenant of the property
> which is subject to the provision . . . *may cause the provision to be stricken
> from the public records* by bringing an action in the superior court in the
> county in which the property is located. The action shall be an in rem,
> declaratory judgment action whose title shall be the description of the
> property. The necessary party to the action shall be the owner, occupant, or
> tenant of the property or any portion thereof. The person bringing the
> action shall pay a fee set under RCW 36.18.012.
> (b) If the court finds that any provisions of the written instrument are
> void under RCW 49.60.224, it shall enter an *order striking the void
> provisions from the public records* and *eliminating the void provisions from
> the title* or lease of the property described in the complaint.

(Emphasis added.) This language remains the same today, but is now codified in

subsection (1) of RCW 49.60.227. When adopting the remedial legislation in 1987, the

state legislature declared:

6

The legislature finds that some real property deeds and other written instruments contain discriminatory covenants and restrictions that are contrary to public policy and are void. The continued existence of these covenants and restrictions is repugnant to many property owners and diminishes the free enjoyment of their property. *It is the intent of section 2 of this act to allow property owners to remove all remnants of discrimination from their deeds*.

LAWS OF 1987, ch. 56 § 1 (emphasis added).

In 2018, the Washington Legislature inserted a subsection (2) into RCW 49.60.227, which added an alternative process to the in rem declaratory judgment action authorized by RCW 49.60.227(1). Subsection (2) declares:

(2)(a) As an alternative to the judicial procedure set forth in subsection (1) of this section, the owner of property subject to a written instrument that contains a provision that is void by reason of RCW 49.60.224 *may* record a restrictive covenant modification document with the county auditor. . . .
(b) The modification document shall contain a recording reference to the original written instrument.
(c) The modification document must state, in part:
"The referenced original written instrument contains discriminatory provisions that are void and unenforceable under RCW 49.60.224 and federal law. This document *strikes* from the referenced original instrument all provisions that are void and unenforceable under law."
. . . .
(f) No filing or recording fees or otherwise authorized surcharges shall be required for the filing of a modification document pursuant to this section.

(Emphasis added.)

This appeal focuses on the language of RCW 49.60.227 and asks this court to discern the meaning and the combined effect of at least three phrases found in subsection

(1) of the statute.  The trio of phrases is: "stricken from the public records," "an order striking the void provisions from the public records," and "eliminating the void provisions from the title."  We must resolve what physical steps those expressions compel Washington auditors to undertake, when asked, with regard to recorded documents.  In doing so, we must also decide whether to include in our calculation of the breadth of the three phrases' consequences a fourth phrase implanted in the legislature's declaration of purpose found in RCW 49.60.227: "removing all remnants from their deeds."  Finally, we must determine whether the alternative procedure found in RCW 49.60.227(2) offers guidance as to the extent of relief the property owner may obtain under subsection (1).

Alex May focuses on the active verbs "strike" and "eliminate" written in RCW 49.60.227(1).  He insists that the county auditor find the 1953 recorded declaration of covenants and white out or black out the offending restrictive covenant and later references to the covenant.  In essence, May demands an unreserved search and destroy mission.  Auditor Vicky Dalton argues against any alteration to a recorded covenant and desires to limit May's relief to a court order or a modification document, filed in the auditor's records on top of the covenant, which recognizes the invalidity of the covenant

I begin my interpretation of RCW 49.60.227(1) with the plain language of the statute.  *State v. Bunker*, 169 Wn.2d 571, 578, 238 P.3d 487 (2010).  Chapter 49.60 RCW does not define the words "strike" or "eliminate."  Therefore, I may look to dictionary

8

definitions to discern those terms' ordinary meanings. *Newton v. State*, 192 Wn. App. 931, 937, 369 P.3d 511 (2016).

The definition provided by *Webster's Dictionary* for "strike" is "to delete, efface, or cancel something with or as if with a stroke of the pen." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2262 (1993). *Merriam-Webster's Collegiate Dictionary* defines the term as simply "to delete something." MERIAM-WEBSTER'S COLLEGIATE DICTIONARY 1236 (11th ed. 2014). The relevant definition provided for "eliminate" is "to cast out: REMOVE, EXPEL, EXCLUDE, DROP, OUST." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 736.

As requested by Alex May, I follow the plain meaning of the words "strike" and "elimination." Both words are stout, energetic verbs that convey the thought of deletion, removal, and expulsion. The words command an excision of all offending verbiage from the public record. None of the words suggest blanketing the offending covenant with another document that repeats, but declares invalid, the racial restriction.

Auditor Vicky Dalton insists that physical alteration of an original recorded document never occurs; rather to preserve a real estate chain of title, changes to title entail the filing of a subsequent document which supersedes the previous document. In a declaration, Dalton lists examples of modifying or amending documents in a chain of title. For example, in the context of a mortgage paid in full, the lender files a release of

9

the mortgage that references the original mortgage.  The borrower does not ask that the county auditor physically remove or destroy the recorded copy of the mortgage.

Auditor Vicky Dalton's analogical argument falls short.  The Washington Legislature enjoys the freedom to think outside the box.  The legislature need not limit a homeowner's remedy to the typical process of filing a second document that declares the encumbrance ineffective.  Other encumbrances and restrictions on the use of property do not incorporate the noxious character of a racial covenant.  No statute or constitutional provision demands that language in a mortgage be struck from the public records and eliminated from the title.

Consistent with the argument of the Auditor, the majority emphasizes that evidence struck by a trial court is not erased from the record.  The decision cited by the majority dealt with a motion to strike language from a trial transcript.  The reference underscores that, when a trial court "strikes" testimony of a witness, the court reporter still includes the testimony in the trial transcript.  This analogy fails for many reasons.  First, inclusion of the stricken language is necessary for an appeal.  Second, in the context of a trial transcript, the word "strike" does not arise from a statutory directive.  Third, in the context of a trial transcript, the court's use of the word "strike" is not followed by the word "eliminate" or the phrase "removing all remnants."  Fourth, the stricken testimony unlikely preserves a spirit of inferiority based on the hue of a person's skin.

RCW 49.60.227(1) does not simply state that the court shall enter an order striking the racial restrictive covenant from the plaintiff's title. Instead, the statute orders that the court strike the covenant "from the public records." "Striking from the public records" means excising the cancerous covenant at its origin.

As already highlighted, RCW 49.60.227(1)(b) contains two distinct clauses: "striking the void provisions from the public records" and "eliminating the void provisions from the title." Under Auditor Vicky Dalton's view of the statute, the two verbs "strike" and "eliminate" and the two clauses mean the same thing. But, under a critical principle of statutory construction the court must give meaning to each verb and to each phrase. When construing statutory language, we must accord each word of a statute with meaning. *State v. Roggenkamp*, 153 Wn.2d 614, 624, 106 P.3d 196 (2005); *Department of Corrections v. McKee*, 199 Wn. App. 635, 645, 399 P.3d 1187 (2017). A related principle of statutory interpretation instructs the court to construe a statute to give effect to all the language used and avoid a construction that would render a portion of a statute meaningless or superfluous. *Ford Motor Co. v. City of Seattle*, 160 Wn.2d 32, 41, 156 P.3d 185 (2007).

Under the canons of statutory interpretation, the phrase "eliminating the void provision from the title" must entail an act beyond the court order "striking" the racial covenant from the public record. Otherwise, the former phrase lacks any efficacy. Assuming "striking" only means entering a court order, the word "eliminating" and the

11

phrase "eliminating from the title" must mean something more and in addition to the court order. That something more would be the county auditor permanently removing the void language from the public records as a result of a court order.

The perceptive reader will note that this dissent concludes that the first phrase in RCW 49.60.227, "stricken from the public records," means erasing all references to the offending covenant from the auditor's records such that this phrase alone compels the relief sought by Alex May. But then the dissent advocates that the later phrase "eliminating the void provisions from the title" must mean something more than excising the covenant from all filings on record. If this be true, what more could be done by the county auditor to the covenant in order to fulfill the principle that the latter clause must bring additional meaning to the statute? One antagonistic to the dissent's reading of the statute may contend that the meaning of the first phrase must mean something less than striking of all references. Even if such be the result, May still prevails because of the potency of the second clause. Any analysis of the statute can end with the observation that at least some of the language in the statute affords the relief sought by May.

Auditor Vicky Dalton highlights that RCW 49.60.227(1) does not mention the need for any activity by a county auditor. But the converse is also true. The statute does not exclude action by the auditor. More importantly, the statute cannot be fulfilled without auditor action. The auditor is the custodian of the public records from which the covenant must be stricken and eliminated. The statute also does not read, as auditor

Dalton reads it, that the remedy is limited to a court order filed on top of the offending covenants. Adorning a skunk in a freshly laundered and crisply ironed T-shirt that reads "I AM NO LONGER A SKUNK" does not strike or eliminate the stench from the skunk.

I turn now to the interplay between subsections (1) and (2) of RCW 49.60.227. Auditor Vicky Dalton insists that RCW 49.60.227(2) supports her position. The subsection provides an alternate remedy, less expensive than a court action, for attacking the racial restrictive covenant. This other fix is the recording of a "modification document." To repeat, subsection (2) declares, in part:

> This document *strikes* from the referenced original instrument all provisions that are void and unenforceable under the law.

RCW 49.60.227(2)(c) (emphasis added).

Auditor Dalton highlights that the legislature used the word "strike" in both subsection (1) and (2) of the statute, so the word must mean the same in both subsections. Therefore, as the argument goes, since filing a second document in accordance with subsection (2) suffices to strike the racial restrictive covenant, a court order, without any action from the auditor, suffices to strike the covenant under subsection (1) of the statute. Nevertheless, the word "strike" in subsection (2) is not followed by language "from the public records." The word "strike" in subsection (2) is also not succeeded by the additional requirement of eliminating the offensive covenant from the title as is found in subsection (1). Auditor Dalton does not read subsection (1) in its entirety.

13

A comprehensive reading of RCW 49.60.227 also supports requiring additional steps beyond issuing and filing a court order to eliminate the covenant as demanded in RCW 46.60.227(1). The provision, in subsection (2), of an easier, but less potent, process to rectify the lingering impact of a racial covenant should not preclude a landowner's enforcement of the statute through stronger means supported by the vigor of the many statutory words in subsection (1). Subsection (2) declares its remedy to be alternative to the remedy in subsection (1). One wonders why the legislature would continue to afford the first process found in RCW 49.60.227(1), when this more expensive process of a declaratory judgment action serves no purpose beyond filing a modification document mentioned in RCW 49.60.227(2). The legislature must have wanted something more to happen under subsection (1) beyond recording a new document if the landowner opted to rely on subsection (1) of the statute.

Alex May emphasizes the declaration of purpose adopted by the state legislature, in 1987, when enacting RCW 49.60.227(1), which purpose is to permit a property owner to "remove all remnants of discrimination from their deeds." Another critical principle of statutory interpretation is a statute should be construed in light of the legislative purposes behind its enactment. *State v. Day*, 96 Wn.2d 646, 648, 638 P.2d 546 (1981). Removal of remnants will not occur without excisions from the original document by the county auditor.

The word "remove" means "to change or shift the location, position, station, or residence of" and "to get rid of as though by moving." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 1921. We need not define the word "all." "Remnant" means "small part, member, or trace remaining." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 1921. Thus, the phrase "remove all remnants" is an even stronger expression than "strike" or "eliminate from the title," as it denotes obliteration of any reference and all traces to the covenant such that no one may see, within the chain of title, any residual iota, jot, or tittle of the restrictive covenant.

Auditor Vicky Dalton emphasizes that, in the context of records filed in a property's chain of title, documents must not be physically altered, rather they must be permanently retained. She references a retention schedule governing Washington State county auditors that declares that recorded documents must be permanently retained "until no longer needed for agency business." OFFICE OF SECRETARY OF STATE, COUNTY AUDITOR RECORDS RETENTION SCHEDULE 14 (Sept. 2010), https://www.sos.wa.gov/_assets/archives/county-auditor-rrs-ver-5.0.pdf. But the legislature can adopt a more specific statute that demands the permanent and total removal of loathsome language to supersede the ordinary process of retention. *Residents Opposed to Kittitas Turbines v. State Energy Facility Site Evaluation Council (EFSEC)*, 165 Wn.2d 275, 309, 197 P.3d 1153 (2008).

15

Auditor Vicky Dalton expresses concern about exposure to liability if she erases language from covenants that prohibit occupancy or use of property by racial groups. RCW 65.04.110 reads that the county auditor is liable to aggrieved parties for damages if he or she "alters, changes, or obliterates any records deposited in his or her office, or inserts any new matter therein." In turn, RCW 40.16.010 states:

> Every person who shall *willfully and unlawfully* remove, alter, mutilate, destroy, conceal, or obliterate a record, map, book, paper, document, or other thing filed or deposited in a public office, or with any public officer, by authority of law, is guilty of a class C felony and shall be punished by imprisonment in a state correctional facility for not more than five years, or by a fine of not more than one thousand dollars, or by both.

(Emphasis added.)

Auditor Dalton's worry about liability lacks foundation. RCW 65.04.110 and RCW 40.16.010 limit liability to unlawfully altering documents. RCW 49.60.227, the more specific statute that directs the striking and elimination of racial restrictive covenants, supersedes the more general statutes concerning the recording of records and the duties of the auditor. *State v. Haggard*, 195 Wn.2d 544, 557, 461 P.3d 1159 (2020). RCW 49.60.227(1) authorizes the erasure of language from recorded documents. The auditor would not "unlawfully" alter the declaration of covenants by expurgating the illicit language.

This court's majority hints that excision of a racial restrictive covenant also violates the Public Records Act, chapter 42.56 RCW. In support of this proposition, the

majority relies on the comment of a legislative committee's staffer, during a committee hearing, that the auditor could not shred a document held in the public records under the act. The majority also employs the staffer's comment as legislative history illuminating the meaning of RCW 49.60.227.

Unfortunately, the committee staffer gave erroneous legal advice. The legislature possesses authority to direct the auditor to excise portions of the records despite provisions of the Public Records Act. The legislature can always adopt exceptions to the Public Records Act. Even without an express exception, a direction to alter the auditor's recording of the offending covenant, as a more specific statute, would supersede any provision of the Public Records Act. *State v. Haggard*, 195 Wn.2d 544, 557 (2020). This court should avoid interpreting a statute on a specious legal opinion of a legislative committee staff member.

During the legislative committee hearing, no legislator stated that he or she did not want the offensive racial covenant removed from the public records. To the contrary, a title officer, during the same legislative hearing, advocated removal of the original document from the records. Hr'g on S.B. 6169 Before the S. Financial Institutions, Housing & Consumer Protection Committee, 59th Leg., Reg. Sess. (Wash. Jan. 19, 2006), at 18 min., 0 sec. to 19 min., 50 sec, *audio recording by* TVW, Washington State's Public Affairs Network, http://www.tvw.org. Two later witnesses emphasized the need to replace the initial declaration of covenants or else title companies would continue

17

to report the presence of the racial restrictive covenant. *Id.* at 21 min., 0 sec. to 23 min., 44 sec.

I now move to constitutional dictates. Constitutional principles apply with intensified force beyond the effect of RCW 49.60.227 and require purging of racial real property covenants regardless of a reading of the Washington statute.

The United States Constitution's Thirteenth Amendment, outlawing badges of slavery, compels complete eradication of the discriminatory covenant from the auditor's records. As already discussed, five years before the recording of the Comstock Park Second Addition declaration of covenants in 1953, the United States Supreme Court ruled such covenants unenforceable. If the Spokane County Auditor's office wanted to abide by the ruling in *Shelley v. Kramer*, 334 U.S. 1 (1948), the auditor should have established a process whereby it reviewed covenants to insure their legality or demanded that the filer sign a statement guaranteeing the absence of any racial covenant in the document submitted for recording. Nassau County, New York, currently implements a policy under which subdivision developers must submit a sworn statement that the subdivision is free from racial covenants. CITY ROOTS COMMUNITY LAND TRUST, CONFRONTING RACIAL COVENANTS: HOW THEY SEGREGATED MONROE COUNTY AND WHAT TO DO ABOUT THEM (2020), https://law.yale.edu/sites/default/files/area/clinic/document/2020.7.31_-_confronting_racial_covenants_-_yale.city_roots_guide.pdf. In turn, the Spokane County

Auditor should have refused to record any restriction of property ownership or use based on race.

A county auditor lacks any duty to record an instrument that violates the law. *Eggert v. Ford*, 21 Wn.2d 152, 154, 150 P.2d 719 (1944); 66 AM. JUR. 2D *Records and Recording Laws* § 56 (2020). The Spokane County auditor's dismissive flouting of *Shelley v. Kramer* in 1953 exemplifies the sad reality of Washington officials' failure to abide by the promise of the Thirteenth Amendment and move the African-American race from segregated locations and lift the race from its subordinate status.

The Spokane County Auditor's recording of the 1953 racial restrictive covenant not only breached the proscription of the Thirteenth Amendment, but also violated the Fourteenth Amendment equal protection clause as determined in *Shelley v. Kramer*. Even if one reads *Shelley v. Kramer* narrowly to only disallow judicial enforcement of a racial covenant but to still permit the private signing of the covenants, a necessary extension of the ruling would preclude any government official from undertaking any action to assist in enforcement. The auditor, like a judge, functions as a public official, and the auditor's conduct constitutes state action. RCW 36.16.030. Like a court ruling enforcing a racial covenant, the recording of a document by the auditor in government records served as a consequential step by an official toward unconstitutional enforcement of the racial covenant. No restrictive covenant may be enforced unless recorded with the county auditor. *Murphy v. City of Seattle*, 32 Wn. App. 386, 392, 647 P.2d 540 (1982).

Finally, in addition to violating the federal constitution when recording the racial restrictive covenant in 1953, the Spokane County Auditor aided the defiance of a federal statute. 42 U.S.C. § 1982, originally adopted as part of the Civil Rights Act of 1866, outlawed racial discrimination in the conveyance of property. *Hurd v. Hodge*, 334 U.S. 24, 30, 68 S. Ct. 847, 92 L. Ed. 1187 (1948).

One may question Alex May's insistence on the county auditor taking the unusual and possibly time consuming task of erasing the racial covenant from the chain of his title. Such a concern for May's doggedness begs some questions. Why can't May accede to the process of filing a modification document presumably satisfactory to others or accept a court order declaring the covenant void as being sufficient? Why can't May devote his vigor to an issue with more weight and with greater practical consequences for the equality of African-Americans? After all, more treacherous vestiges of enslavement abound. Every week brings news of another arbitrary, abusive, and appalling death of a Black American.

Consider a story. A single woman, with an African-American young son, purchased a home in Spokane. I assign the woman the fictitious name of Terry. After signing an earnest money agreement, Terry received a title report that warned of restrictive covenants encumbering her real property. She read the covenants and found that no one other than a member of the Caucasian race may live within her property's subdivision. Terry needled her real estate agent that the agent never warned her of the

restriction. The realtor informed Terry that she need not worry about the covenant because it was not enforceable. Terry wondered why the covenant appeared on her title report if it was invalid. She was not a lawyer and did not know if the realtor told her the truth about the invalidity of the covenant. Terry asked the real estate agent if the agent would sign a paper guaranteeing that the covenant was not enforceable. The agent declined because the agent rejected the role of making promises about a land's title. "Talk to the title company," the realtor said to her client, Terry.

Terry talked to an officer of the title company, who also told her that the covenant was unenforceable. Terry asked the officer to place language in her title policy that guaranteed the provision would not be enforced. The officer failed to answer directly Terry's request, but told her she was overly worried about the situation. "No one else complains about the outdated covenants," he intoned. The title company agent told Terry to see a lawyer because a lawyer might take steps to file some document declaring the covenant void. The agent, not knowing the color of Terry's son, added: "What difference does it make to you? You are White."

Terry began to wonder what kind of neighbors lived within her home's subdivision, if no one had taken any steps to remove the racial covenant. She questioned whether she wished to live with her son in the neighborhood. Terry also wondered why she must incur the expense of a lawyer to gain assurance of the invalidity of the covenant. The title company officer, however, warned the cold footed Terry that she must purchase

21

the property or forfeit her earnest money deposit, because the presence of the covenant in her title did not afford her good cause to rescind the real estate transaction.

With some insignificant changes, Terry's story is true. Although the story concerns a Caucasian mother, African-American buyers have similar stories and suffer similar, if not stronger, emotions when faced with the discriminatory covenants.

Random studies estimate that racial covenants continue to infect title to millions of American homes. African-Americans repeatedly face the disquieting presence of the covenants when purchasing homes. Justin Wm. Moyer, Racist Housing Covenants Haunt Property Records across the Country: New Laws Make Them Easier to Remove, WASHINGTON POST, October 22, 2020, https://www.washingtonpost.com/local/racist-housing-covenants/2020/10/21/9d262738-0261-11eb-8879-7663b816bfa5_story.html; Clare Trapasso, *"Legacy of Shame": How Racist Clauses in Housing Deeds Divided America* (June 16, 2020), https://www.realtor.com/news/trends/racial-covenants-systemic-racism. Caucasians do not face this affront. Whites need not bring a lawsuit to have racial covenants declared unenforceable. Caucasians need not incur the expense of an attorney to prepare a document in order to remedy racial discrimination that the county auditor should have never allowed in the first place. White Americans do not bear the cost of eradicating the unending burdens of slavery and apartheid.

In 2000, California adopted a process for homeowners to record a document in their property's chain of title to remove racial language. CAL. GOV'T CODE § 12956.2. The

redacted document sits on top of the original, but does not replace it, so a record of the racist language remains. The California statute includes no statutory provision, similar to RCW 49.60.227(1), that directs the striking and elimination of racial restrictive covenants. As reported by one newspaper:

> . . . And to some, it's [the limited California remedy is] not enough. The state should have removed racial covenants from its property records years ago, said Betty Williams, president of the Greater Sacramento NAACP [National Association for the Advancement of Colored People]. "For me, it's validation that America says this is wrong. We need to have that," she said.

Marisa Kendall, 'Whites only' *No More: California Bill Would Remove Racist Real Estate Language*, MERCURY NEWS, Aug. 7, 2020, https://www.mercurynews.com/2020/08/07/whites-only-no-more-california-bill-would-remove-racist-real-estate-language/.

In addition to refusing to comprehend the symbolic impact of recorded racial covenants, the Spokane County Auditor's legal position relegating Alex May to alternative cures fails to recognize the practical impact of racial covenants loitering and lingering in auditor files. Unfortunately, some homeowners still believe a racial covenant to be valid. The presence of the covenant may subtly encourage some homeowners to discreetly sell only to whites. Blacks may be reluctant to purchase residences in a neighborhood that they learn retains scars from a history of racial territoriality. Richard R.W. Brooks & Carol Rose, *Racial Covenants and Segregation, Yesterday and Today*

23

(Joseph & Gwendolyn Straus Institute for Advanced Study of Law & Justice, Working Paper No. 08/10, 2010), http://www.law.nyu.edu/sites/default/files/siwp/Rose.pdf; Judy L. Thomas, *'Curse of Covenant' Persists—Restrictive Rules, While Unenforceable, Have Lingering Legacy*, KANSAS CITY STAR, July 27, 2016, http://www.kansascity.com/news/local/article92156112.html.

If Alex May prevails in his suit, the eradication of the racial restrictive covenant from the 1953 declaration of covenants would also remove the offending language from the title to all other property within Comstock Park Second Addition. The remedy advocated by Auditor Vicky Dalton and ordered by the trial court does not assist other homeowners within the subdivision. The court order issued by the Spokane County Superior Court only referred to Alex May's lot.

I suspect concern among Washington county auditors of a court adopting this dissent's reading of the law and decreeing the search and destruction of all racial restrictive covenants throughout real estate records. But so far RCW 49.60.227(1) only requires such action at the request of a property owner. Regardless, I suspect some computer expert, in our State of Microsoft, could configure an algorithm to efficiently identify and expunge all ethnic covenants from Washington title records. Many organizations have already mapped neighborhoods retaining racial restrictive covenants, mapping which could aid in identifying blanketed territories. University of Washington history professor James Gregory with his students has charted Seattle communities.

In this appeal, neither party discusses the mechanics needed to expunge language from auditor records. Nevertheless, Auditor Vicky Dalton does not contend that excision of all racial restrictive covenants in Spokane County, let alone throughout Washington's thirty-nine counties, would be impossible or unduly expensive.

Regardless of the expense, Washington State owes our African-American citizens the physical eradication of public language that frustrates the purposes behind the post-Civil War Amendments, that perpetuates white supremacy, and that prolongs humiliation of minority races. Even if the expungement of covenants lacks any practical significance, Washington African-Americans deserve a symbolic gesture in exterminating one of the interminable and lasting badges of slavery. Washington courts owe African-Americans a judicial order that recognizes county auditors should have never recorded the shameful restrictions and a decree that declares that Blacks and other minorities now are and always should have been welcome in every room, in every home, on every block, in every neighborhood, in every subdivision, and in every community throughout this state, not as retainers, but as equal human beings entitled to the same respect and dignity afforded other members of humanity.

Contrary to the assertion of this court's majority, the loitering of racial restrictive covenants on file with the county auditor does not function as a beneficial historic record of ethnic intolerance in the United States. Eradicating auditor records of offensive covenants will not whitewash the ugly truth of American apartheid. Literature, including

this legal dissent, will teach generations of our nation's children about property ownership restrictions that precluded those with darker skin tincture from full enjoyment of American prosperity and encaptured African-Americans within a fence of belittling isolation. County auditor records do not serve as books in a library or as historic documents in a museum. County auditor pages function as a town square for real property transactions. The time has come to rip, from the pages of official records, white inscriptions of supremacy. The time has come to tear down monuments to slavery and racial segregation on display in this public square.

I DISSENT:

_____
Fearing, J.